IN THE MATTER OF ROBERT S. MILLER, AN
ATTORNEY AT LAW.

Argued March 19, 1985—Decided October 1, 1985.

*Colette A. Coolbaugh,* Executive Counsel, argued the cause for complainant, Disciplinary Review Board.

*Alan Jay Rich* argued the cause for respondent.

PER CURIAM.

This disciplinary matter is before the Court on an order to show cause why respondent, Robert S. Miller, should not be

disbarred or otherwise disciplined. The Decision and Recommendation of the Disciplinary Review Board (DRB) found respondent guilty of unethical conduct and recommended a public reprimand. Our independent review of the record leads us to the same conclusion. We therefore adopt the following DRB Decision and Recommendation, with several modifications as noted below:

This matter is before the Board [DRB] on a presentment filed by the District X (Morris County) Ethics Committee.

The presentment charges that Respondent had entered into a business relationship with a client in a manner contrary to *DR* 5–104(A); extracted a release from the client at the termination of their business/legal relationship, contrary to *DR* 6–102(A); had negligently handled an estate for this client, contrary to *DR* 6–101(A)(2); and had paid himself legal fees from estate funds without notice to, prior consent from, or accounting to the client, contrary to *DR* 9–102(B)(3) and (4).

The factual background underlying this matter commenced prior to Respondent's representation of the complainant. [In October, 1976,] Respondent, with a partner, Harold Goglia, [Jr.,] formed a corporation known as Archer Pace Associates, Inc. [ (Archer Pace) ] to provide general messenger and subpoena services primarily for attorneys.

When Goglia later decided to leave the company, he and Respondent signed an agreement on September 12, 1977 whereby Respondent would buy out his interest in the corporation. This agreement provided that the company would [purchase all of Goglia's stock and] satisfy all loans [for a total of] $4,000 * * *, $1,000 of which was payable upon execution of the agreement and the balance payable in monthly installments. The company did not comply with the payment terms of this agreement. Respondent, at a later date, performed legal services for Goglia in satisfaction of the outstanding debt.

On December 16, 1977, Respondent personally signed for a $15,000 loan with United Jersey Bank for Archer Pace. Of the total amount, Respondent kept $10,000 as repayments of loans he had made to the company during the preceding year. While the balance was deposited in the Archer Pace operating account, $1,000 from this was paid as a placement fee for the loan, leaving a $4,000 net balance to the company.

In February 1978, Respondent dissolved his sole practice of law and joined a law firm. About a month before this, he was contacted by Mrs. Lynn Krauthamer, the grievant, to handle the estate of her husband who died December 8, 1977. Respondent had represented her before in various matters over many years. The estate had a value of over $350,000. A substantial portion of this was represented by shares held by decedent in two corporations operated with a partner shareholder. As a result of [a] buy-sell agreement, decedent's widow was to receive $135,000 in installments for the shares.

In handling the estate matter, Respondent established a trust account. Of $110,000 he received in trust, $50,000 was placed in escrow under an agreement with the attorneys for the surviving shareholder to guarantee payment of estate and inheritance taxes. In May 1978, he sent complainant $50,000 from the $110,000 held in trust, suggesting that the money should be placed in a savings account until [they selected] other financial investments * * *. During this period, Respondent handled other transactions regarding this estate.

After Mrs. Krauthamer had received the $50,000, Respondent informed her about his business enterprise, Archer Pace. He offered to sell an interest in it to her. Mrs. Krauthamer was involved in other business ventures at this time and, according to Respondent, she felt that this would be a good business for her daughter to operate. Initially, he told her that she and her daughter could buy into the company for $10,000 ($5,000 each). Later, the purchase price was increased by an additional $15,000 to satisfy the outstanding bank note. This increased price, however, gave the grievant a controlling interest (75%) in the company.

Respondent was satisfied that Mrs. Krauthamer was completely knowledgeable about Archer Pace before she entered into the agreement. Financial records, including check books, obligations and accounts receivable statements were provided [by Respondent] for review by her and her daughter, a trained bookkeeper. At this time, the company was substantially indebted and had only a small income. * * * Respondent advised her that she could seek the advice of independent counsel while considering this matter, but he did not encourage her to do so. He did urge her, however, to have the financial records [that he] provided reviewed by an accountant. [Mrs. Krauthamer declined to consult her accountant before consummating the transaction.]

The business did not prosper. During the summer of 1979, Mrs. Krauthamer's disenchantment reached the point where she wanted to disassociate herself from it. At her insistence, a meeting was arranged with Respondent's employer to attempt to work out an agreement to sell her interests.

Shortly after this meeting, Respondent sent Mrs. Krauthamer a proposed buy out agreement * * *. She had [the agreement reviewed by] her New York counsel [with whom she had] discussed the Archer Pace business venture * * * in 1978, but only after she had invested money in it. Respondent's buy-out proposal was rejected by this attorney who then submitted a revised agreement to Respondent which he accepted. This document, signed on December 13, 1979, provided for the execution of a $9,000 promissory note with interest payable at six per cent by the corporation. It also acknowledged a $6,000 personal obligation of Respondent, payable on demand. The agreement further provided that Mrs. Krauthamer sign a release for the benefit of Respondent.

In June 1980, she filed a civil action against Respondent for his personal indebtedness. A default * * * was entered on August 22, 1980 [and default judgment entered in December, 1980.] Although Respondent had filed for bankruptcy, he made no attempt to discharge his obligations to the grievant thereunder. On November 17, 1983, Respondent paid Mrs. Krauthamer a total of $18,742.26, representing full payment of all corporate and personal obligations.

During his representation of the estate, Respondent had assumed control over estate funds. On August 3, 1978, Respondent paid $5,693.13 to the New Jersey Inheritance Tax Bureau as estimated inheritance taxes. Respondent had not promptly prepared summaries of estate assets, expenses and estimated taxes. [On October 14, 1978, Respondent filed the state transfer inheritance tax report. On October 20, 1978, the New Jersey Division of Taxation sent Respondent a request for additional information regarding the estate. For no apparent reason, Respondent did not answer this inquiry until March 26, 1979.] When he filed the Federal Estate Tax Return on March 21, 1979, approximately six months late, there was no federal estate tax liability. He thereby unnecessarily encumbered estate funds under the escrow agreement with decedent's former partner. After all taxes were paid, he retained approximately $4,000 of estate funds in a noninterest bearing account while continuing to hold $40,000 of estate funds in a savings account.

During 1978 and 1979, Respondent paid himself $5,000 for legal fees. He withdrew his legal fees without prior submission of the charges to Mrs. Krauthamer, nor did he have her express[ ] permission to withdraw these funds. After Mrs. Krauthamer retained another law firm to [complete] the estate matter, Respondent forwarded the remaining estate money [to that firm] along with a statement of services dated February 26, 1980, listing the services for which he had previously taken payment.

Our review of the record indicates that during this same period, respondent borrowed significant sums from Mrs. Krauthamer and Archer Pace. On September 11, 1978, respondent borrowed $5,000 from Mrs. Krauthamer, interest-free, payable on demand. This money came from the estate savings account, which was controlled jointly by respondent and Mrs. Krauthamer. On October 12, 1978, respondent borrowed $1,000 from Archer Pace to pay a personal income tax obligation. On January 6, 1979, respondent borrowed an additional $1,000 from Mrs. Krauthamer, again interest-free and payable on demand. The source of funds for this loan was the estate checking account, controlled solely by respondent. Respondent did not repay any of these loans as originally agreed, but the two loans from Mrs. Krauthamer later became the subject of the default judgment that was subsequently paid in full.

In addition, respondent encouraged Mrs. Krauthamer to lend significant sums to Archer Pace. On June 22, 1978, only three weeks after Mrs. Krauthamer acquired her controlling interest in Archer Pace for $25,000, respondent advised Mrs. Krautham-

er to lend the company an additional $5,000 to meet current operating expenses. The money for this loan came from the estate funds that were then held in respondent's trust account. The loan was at 10% interest and was to be fully repaid in three and one-half years. On September 27, 1978, Mrs. Krauthamer lent Archer Pace an additional $2,500 from the estate savings account that she controlled jointly with respondent. No promissory note was executed to evidence this loan, but it was to be repaid, as company income would allow, at 10–12% interest. Of the $7,500 total that Mrs. Krauthamer lent to Archer Pace, she was repaid approximately $2,200, including interest. Respondent did not advise Mrs. Krauthamer to consult independent counsel regarding any of her loan transactions with Archer Pace or himself.

The DRB's Conclusion and Recommendation follow its summary of the proceedings before the District X Ethics Committee:

Subsequent to her retention of new counsel and Respondent's failure to satisfy the civil judgment, Mrs. Krauthamer filed a complaint with the District X Ethics Committee on November 30, 1982. Hearings thereon were held during June-September 1983. Based on the testimony presented, the panel concluded that Mrs. Krauthamer had looked to Respondent for legal advice both before and during her involvement with Archer Pace. The panel concluded that Respondent took "ineffectual steps," if any at all, to see that she was properly represented regarding this business transaction, noting that [although] her business experience [would perhaps] diminish Respondent's obligation, [he did not satisfy his burden] under the disciplinary rules. See *DR* 5–104(A). The panel did not find fraud or any illicit intent attributable to Respondent concerning either the investment in Archer Pace or the loans made to him by Mrs. Krauthamer.

The panel found that Respondent violated *DR* 6–102(A) by extracting a release from Mrs. Krauthamer at the close of their business/legal relationship. It further found a "pattern of negligence" throughout the handling of the estate by Respondent, noting the loss of interest to the estate, the faulty handling of escrow funds, lack of diligence regarding inheritance and estate tax matters, and Respondent's disregard of Mrs. Krauthamer's best interests in his management of the estate, all contrary to *DR* 6–101(A)(2). The panel further found a violation of *DR* 9–102(B)(3) and (4) in Respondent's payment to himself of legal fees from estate funds without notice to, prior consent from, or accounting to his client.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Committee in finding Respondent guilty of unethical conduct are fully supported by clear and convincing evidence.

The Board finds that Respondent's business and legal relationship with Mrs. Krauthamer violated *DR* 5–102(A). When Respondent sent Mrs. Krauthamer a check for $50,000 from the estate, he suggested that she place the money in a savings account until they jointly selected the proper financial investments. Consciously or unconsciously, Respondent set the stage for the subsequent events. Shortly after this, Respondent informed Mrs. Krauthamer about his commercial business venture. Complainant entered into this transaction without the advice of independent counsel. At this point, it is necessary to determine if there was a knowing, intelligent and voluntary consent by Mrs. Krauthamer to enter this business venture with Respondent. *In re Dolan*, 76 *N.J.* 1, 13 (1978).

When a lawyer has a personal, economic stake in business dealings with a client, he must see to it that the client understands that his objectivity and ability to give the client undivided loyalty may be affected. In such a situation, the lawyer has a duty to explain carefully, clearly and cogently why independent legal advice is required. *In re Kamp*, 40 *N.J.* 588 [, 595–97] (1963). See also *In re Wolk*, 82 *N.J.* 326, 333 (1980). The attorney should explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the client have independent counsel. *In re Kamp, supra*, 40 *N.J.* at 596.

"An attorney who enters into business ventures with his client does not, in the eyes of his client or the public [generally], shed in chameleon fashion his professional standing and obligation and there is no just reason why he should be permitted to do so." *In re Carlsen*, 17 *N.J.* 338, 346 (1955). When an attorney chooses to become a part-time business man, he must carry with him his elemental obligation of honesty, uprightness and fair dealing. *Ibid.*

Respondent made available to Mrs. Krauthamer the business records of the corporation and encouraged their review by an accountant. He personally[, however,] made little effort to educate her about the financial condition of the business. Although he informed her that she could seek independent legal advice, he also indicated that it would not be necessary. She accepted his advice because she had a high regard for him as her attorney of many years and as a friend. "That he suggested she seek independent advice is of little consequence under the circumstances of this case; he had every reason to believe that she would not do so." *In re Wolk, supra*, 82 *N.J.* at 333.

Under the circumstances, it is clear Mrs. Krauthamer did not enter this business venture with Respondent with full intelligent knowledge and the necessary independent advice. As a general rule, an attorney should refrain from engaging in a business transaction with a client who has not obtained independent legal advice on the matter. *In re Barrett*, 88 *N.J.* 450, 453 (1982). The reasoning for this proscription is obvious; the attorney's judgment can be impaired by his self-interest. Although the transaction in this matter occurred

prior to *Barrett*, the Supreme Court consistantly [*sic*] has cautioned the bar about the dangers inherent in attorney-client business dealings. See *In re Carlsen, supra; In re Gavel*, 22 *N.J.* 248, 262 (1956); and *In re Hurd*, 69 *N.J.* 316, 330 (1976).

At the conclusion of their business relationship, Respondent had Mrs. Krauthamer execute a release for any and all claims she had or may have against Archer Pace and Respondent individually. The Board finds that there was no violation of *DR* 6–102(A). Respondent did not attempt to exonerate himself or limit his liability to Mrs. Krauthamer for his personal malpractice. This release pertained solely to debts of Archer Pace and Respondent individually, as a business man, and not as an attorney.

The Board further finds a "pattern of negligence or neglect" in Respondent's handling of the estate. *Matter of Getchius*, 88 *N.J.* 269, 276 (1982). The loss of interest to the estate, the faulty handling of the escrow funds, his lack of diligence regarding the estate tax liability and Respondent's irresponsibility concerning the complainant's best interest in his management of the estate were contrary to *DR* 6–101(A)(2).

The Board further finds that Respondent's method of taking fees violated *DR* 9–102(A)(2). Respondent drew checks against the estate funds for his legal fees without submitting an accounting to his client before so doing. The client never [expressly] authorized such withdrawals.

■ *DR* 9–102(A)(2) [, in reference to attorney trust accounts,] provides: Funds belonging in part to a client, a portion of which the lawyer or law firm will be entitled to receive for his own use must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

The requirement that fees may be withdrawn only in the absence of a dispute clearly assumes that the client has at least been advised on these matters. *In the Matter of Marine*, 82 *Wis.*2d 602, 264 *N.W.*2d 285, 288–289 (Sup.Ct.1978). For a fee to be undisputed, it is obvious that prior agreement must have been reached between the attorney and client as to the services rendered, the amount of the fee, and the time[ ] [of payment.] By not giving his client [prior] notice of services rendered and withdrawing his legal fees from the estate funds, Respondent violated *DR* 9–102(A)(2).

■ In determining the proper discipline to be imposed upon an attorney guilty of misconduct, aggravating and mitigating factors must be taken into consideration. *Matter of Infinito*, 94 *N.J.* 50, 57 (1983). An attorney's contrition and his admission of wrongdoing are mitigating factors in his favor. *In re Rosenthal*, 90 *N.J.* 12, 17 (1982).

■ Respondent has been a member of the Bar since 1964 and has no prior disciplinary record. He acknowledges that his conduct during this period did not comport with the Disciplinary Rules. He was fully cooperative during the proceedings against him. He has [substantially] reimbursed his former client for her losses. He has since this matter devoted his full energies to the practice of law and is no longer involved in other business ventures.

Based on the totality of the circumstances here, the Board recommends that Respondent be publicly reprimanded.

The Board further recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.

The Court views with grave concern respondent's withdrawal of legal fees from estate funds without the prior express consent of his client. It is due only to the unique mitigating factors present in this case that we have withheld more severe disciplinary action. There is no allegation or suggestion in the record that the amount of the fee taken by respondent was unreasonable. Moreover, the respondent and this particular client had a close relationship over a number of years and were working together as business associates. Our decision is influenced also by the mitigating factors set forth in the Decision and Recommendation of the DRB.

Accordingly, we hereby publicly reprimand respondent, Robert S. Miller, for his professional misconduct. The Court further orders him to reimburse the Ethics Financial Committee for appropriate administrative costs incurred in this matter, including the production of transcripts.

*For reprimand*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.