IN THE MATTER OF ROGER E. SMYZER, AN ATTORNEY AT LAW.

Argued March 31, 1987—Decided July 10, 1987.

*Colette A. Coolbaugh*, Executive Counsel, Disciplinary Review Board, argued the cause on behalf of Office of Attorney Ethics.

*Dennis S. Deutsch* argued the cause for respondent (*Gallo, Geffner, Fenster, Farrell, Turitz & Harraka*, attorneys).

PER CURIAM.

This disciplinary proceeding arises out of two presentments filed by the District VIII Ethics Committee. Respondent is charged with fraudulent and deceptive conduct regarding certain business transactions with his clients, failing adequately to protect his clients' investments, and commingling personal monies with client trust funds. The Disciplinary Review Board

(DRB or Board) concluded that respondent was guilty of unethical conduct, and recommended that he be disbarred. Upon an independent review of the record, we find the Board's conclusions to be amply supported by the evidence, and therefore order respondent's disbarment.

I

The facts of this case, as found by the DRB, are as follows:

*Whitesell matter*

In 1979, following the sale of her home, Mrs. Roseann Whitesell had planned to invest the proceeds [$20,000] in a savings account. Respondent, who represented her on the closing and other matters, suggested she make a short term investment with Equities Holding Company (Equities) at 10% interest per month. * * * According to Mrs. Whitesell, respondent did not tell her he had an interest in Equities, nor did he explain the risks of this investment to her. Since she trusted respondent, she gave him money to invest. Respondent testified he informed her she could seek independent counsel but she had declined to do so.

Respondent maintained he had not solicited the investment but had told Mrs. Whitesell he had some personal investments with Equities which were paying a substantially high rate of interest but that there was a risk involved. He informed her he believed Equities would be a successful investment.

In September and October 1979 respondent received on Mrs. Whitesell's behalf a check for $2,000 which represented the interest earned for those months. At Mrs. Whitesell's request, respondent sent her a letter on October 17, 1979 stating he had invested her $20,000 as a loan to Equities and further stated the loan

... has been personally guaranteed by all three directors of the Corporation in that they have represented to me that they would insure that the Corporation meets its commitments under the loan agreement.[1]

When respondent had received the $20,000 from Mrs. Whitesell $5,000 of it was paid to Repsco, Inc., a company respondent formed in 1978. He was its principal officer and stockholder.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Equities confirmed by letter dated July 30, 1979 that respondent had "loaned" $40,000 to it. The confirmation consisted of a $16,000 demand note dated July 23, 1979 made payable to respondent at no interest and a $24,000 seven-day note dated July 30, 1979 made payable to respondent's trust account at no

---

[1]The record reveals that a "guarantee" was never executed. The document *referred to in respondent's letter merely guaranteed performance of an agree*ment under which certain rental income of Equities would be diverted to respondent's trust account. However, no payments were made under that agreement.

interest. There was no indication that Mrs. Whitesell was the beneficiary of the note, nor that the loan reflected her investment. At the ethics hearing, respondent explained that the $16,000 note represented his personal investment and the $24,000 note represented Mrs. Whitesell's investment. This amount reflected her investment of $20,000 and interest for the first two months.

When no check was received for November 1979, Mrs. Whitesell contacted respondent who explained that Equities had a cash flow problem but assured her that the money would be forthcoming. She telephoned respondent in February 1980. He arranged a conference call between them and the president of Equities. Mrs. Whitesell was reassured that she would receive her money shortly. * * * Mrs. Whitesell [subsequently] * * * retained another attorney to obtain a refund of her investment. When that proved unsuccessful, a civil action was filed against respondent on October 31, 1980. A default judgment was entered January 7, 1981 for $15,000 plus interest. As of November 22, 1982 when Mrs. Whitesell testified before the ethics committee, she had not received the return of any of her money.

At the ethics hearing, respondent stated he had invested his own money in Equities had lost over $30,000. The ethics committee concluded that respondent's actions were deceptive and fraudulent. It further concluded respondent's record keeping was improper and he had failed to properly protect Mrs. Whitesell's interests.[2]

*      *      *      *      *      *      *      *

*Clark and Gramache matter*

Respondent represented Jane Clark and her brother Roger Gramache in various legal matters and handled some investments for them. In the fall of 1977 Mrs. Clark and her grandparents agreed to purchase a house so they could reside with her. The purchase would be financed by cashing in each grandparent's $50,000 annuity. Mrs. Clark's grandfather died before the proceeds of the policy were received. Respondent was named the trustee of the grandfather's insurance proceeds which exceeded $50,000. However, Mrs. Clark testified at the ethics hearing that when she signed the August 2, 1979 agreement she thought respondent would be the trustee for her grandmother's policy, not her grandfather's. She had not read the agreement but thought she was authorizing respondent to invest her grandmother's funds.

---

[2]Specifically, the Ethics Committee found that respondent violated *DR* 2-101(A) and *DR* 2-101(B)(6) (providing misleading and deceptive information to a client), *DR* 5-104(A) (entering into business transactions with a client), *DR* 9-102(B)(3) and (4) (failure to maintain appropriate records with respect to client funds and failure to promptly pay same to the client when due), and *DR* 1-102(A)(4) and (6) (engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation).

Effective September 10, 1984, the Rules of Professional Conduct or the American Bar Association, as modified by this Court, govern the conduct of the members of the bar of this State. *R.* 1:14. Respondent's actions occurred prior to this date, and are consequently governed by the Disciplinary Rules then in force.

Beginning in April 1978 Mrs. Clark invested money in Repsco Corp. Respondent had explained to her that this company obtained funds from small investors and made large corporate loans. She knew respondent was a corporate officer and believed there were other officers as well. Respondent did not tell her he was the only officer and stockholder. Respondent had informed her that the investments would be for six-month periods and investors would receive $2,000 a month in interest. In April 1978 Repsco received a total of $10,000, representing a $5,000 loan from Mrs. Clark, and $5,000 from her brother and grandfather. The following month Mrs. Clark invested an additional $25,000 in the company. For this loan she expected to receive monthly interest payments of $500. At the end of the six-month period, she reinvested her funds in the company. She did not receive any documents or security for these loans. Through respondent she invested $10,000 in July 1978 with Com Link International; $10,000 in January 1978 with E.H. Limited which loaned the proceeds to Equities, and during April 1979 she invested $7,000 with Equities. Her brother also loaned $3,000 to Equities. Respondent, on behalf of Mrs. Clark's grandmother, received $50,000 in insurance proceeds on August 31, 1979.[3] On that same date he loaned $48,500 to D.L.B. Financial Corporation. Among the investments from her grandfather's policy were $2,000 as a loan to Repsco Air and $3,000 as a loan to Equities. Mrs. Clark had never heard of any of these companies before respondent advised her to lend money to them. She had no prior investment experience and trusted respondent's judgment. At no time had respondent advised her to seek the advice of an investment counsel or an independent attorney. While she received some interest payments on the loans, the principal was not repaid.

At the ethics hearing, Mrs. Clark testified that she was totally unaware of the $48,500 loan to D.L.B. and did not learn of it until she attended a hearing of the Clients' Security Fund. The ethics committee concluded respondent's actions were deceptive and fraudulent. [*DR* 1–102(A)(4), 1–102(A)(6), 2–101(A), 2–101(B)(6), 5–104(A).] It concluded he improperly handled the investments, improperly kept records and failed to protect the interest of his client. [*DR* 9–102(B)(3), (4).]

The DRB addressed three additional instances of respondent's misconduct:

*Edzek matter*

After representing Mr. and Mrs. Lawrence Edzek in the sale of their home in March 1979, respondent made a $10,000 loan to Equities on their behalf. As with the Whitesell and Clark/Gramache matters, respondent did not procure the doc-

---

[3]This sum constituted the proceeds of the annuity in the name of Mrs. Clark's grandfather, held in trust for Mrs. Clark's grandmother pursuant to the trust agreement dated August 2, 1979.

uments to support this transaction. By letter dated August 2, 1979, respondent disclosed that he owned a small amount of stock in Equities, and that he and several other clients had advanced funds to the company;[4] enclosed with this letter was a copy of the two notes totalling $40,000 referred to in connection with the Whitesell matter. Although the Edzeks did not appear at the ethics hearing, a letter from Mr. Edzek was presented to the Committee. In the letter, Edzek acknowledged that there had been no repayment of principal or interest, but expressed satisfaction that respondent had fully explained the transaction and his interest in it.

*Baillet matter*

Respondent represented Russell Baillet with respect to a real estate closing that took place on September 23, 1979. On June 26, 1979, Baillet transferred $1,750 to respondent to hold in trust until the closing. An audit of respondent's records revealed that his trust account balance was $687.39 on August 29, 1979. Although respondent denied knowledge of any impropriety in the maintenance of his trust account, the Ethics Committee concluded that he had invaded trust funds and maintained inadequate records, contrary to *DR* 9–102(B)(3) and (C).

*Rich matter*

In 1979, respondent assisted Sam Rich in forming a corporation known as Concology. Respondent was to be compensated for his services with a stock participation in the company; he was also to be named a director and officer of the firm. In January 1980, respondent deposited an investor's check for $11,250 in his trust account, with instructions from Concology to draw various checks against this sum. All of the checks drawn were returned for insufficient funds. Respondent ex-

---

[4]In testimony before the Ethics Committee in connection with the Whitesell matter, respondent denied having any ownership interest in Equities, and stated that he had refused an offer of 525 shares made to him by the company's chairman.

plained that the overdrafts occurred because a check from Equities payable to Repsco Inc., and deposited into his trust account, was not paid. Apparently, respondent had already drawn on the Equities deposit.

In a second matter, respondent issued a $30,000 check on Concology's behalf against his trust account to complete a closing. Respondent asked his adversary to wait to deposit this check until he had an opportunity to deposit a second $30,000 check, payable to Concology, into his trust account. Because respondent waited several days to deposit this item, the check drawn on his trust account was returned. Respondent subsequently replaced the check with a wire transfer. The Ethics Committee found that respondent violated *DR* 9–102(B)(4) and (C) by commingling Concology funds with those of Equities, by failing to maintain adequate records, and by invading trust funds.

Upon reviewing these findings, the DRB reached the following conclusions:

> This record clearly demonstrates that respondent, who was admitted to the bar in 1974, accepted substantial sums of money from clients for investment. Respondent failed to fully explain the nature of the investments, nor did he disclose his interests in the companies involved. He did not keep his clients informed of the nature of the investments. Respondent provided his clients with no documentation so they could protect their investments. He also failed to segregate the funds of his clients which resulted, at times, in invasion of clients' funds.
>
> The record indicates that respondent and Equities were not dealing in an arms-length fashion. Respondent was an active agent on behalf of this company. His conduct was more solicitous of the company than of his clients.
>
> When an attorney has a personal stake in a business dealing with a client, he must see to it that the client understands that his objectivity and ability to give the client undivided loyalty may be affected. He has a duty to explain carefully, clearly and cogently why independent legal advice is required. *In re Miller*, 100 *N.J.* 537, 544 (1985); *In re Wolk*, 82 *N.J.* 326, 333 (1980).
>
> A client will entrust an attorney with his funds because he trusts the attorney. "It is a trust built on centuries of honesty and faithfulness." *In re Wilson*, 81 *N.J.* 451, 455 (1979). This trust must be preserved. *Id.* at 456. The Board concludes that respondent's conduct fell far short of the high standards of his profession. *In re Ryan*, 66 *N.J.* 147, 150 (1974).

The Board also found that because respondent commingled personal monies and trust funds, the overdrafts in his trust account constituted knowing misappropriation. Noting that the Clients' Security Fund had already paid claims in excess of $91,000 as a result of respondent's misconduct, the Board unanimously recommended his disbarment.[5]

## II

Our independent review of the record leads us to concur with the DRB's conclusion that respondent's repeated violations of the rules governing attorney conduct require imposition of the strongest discipline in this case. The most serious instances of respondent's misconduct concern the Whitesell, Clark/Gramache, and Edzek matters, and his role in the investment decisions made by these clients. Respondent was approached by these individuals for investment advice; in each case, he encouraged them to advance monies to financially-troubled companies in which he held an interest.

■ Respondent's conduct in these matters constituted a clear violation of *DR* 5–104(A), which prohibits an attorney from entering into business transactions with a client if the two have differing interests, unless the client has consented after full disclosure.[6] We have consistently emphasized that an

---

[5]Respondent was suspended from the practice of law by our order dated April 15, 1981. He did not appear before the Board in connection with this matter; respondent's counsel advises us that he no longer resides in this state.

[6]This rule has been carried forward with minor modifications into the Rules of Professional Conduct, which became effective on September 10, 1984. *RPC* 1.8(a) now provides:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms that should have reasonably been understood by the client, (2) the client is advised of the desirability of seeking and is given a reasonable

attorney should approach such business arrangements with caution, and must carefully explain to his client the need for independent legal advice:

When a lawyer has a personal stake in a business deal, he must see to it that his client understands that his objectivity and his ability to give his client his undivided loyalty may be affected. [*In re Wolk*, 82 *N.J.* 326, 333 (1980).]

*See In re Miller*, 100 *N.J.* 537, 543 (1985); *In re Barrett*, 88 *N.J.* 450, 453 (1982). Nor will a passing suggestion that the client consult a second attorney discharge the lawyer's duty when he and his client have differing interests. *See In re Wolk, supra,* 82 *N.J.* at 333; *In re Hurd,* 69 *N.J.* 316, 329 (1976). In view of the trust placed in an attorney by his clients and the attorney's often superior expertise in complicated financial matters, a lawyer must take every possible precaution in ensuring that his client is fully aware of the risks inherent in the proposed transaction and of the need for independent and objective advice.

Even the most casual review of this record reveals that respondent's disclosures to his clients were woefully inadequate. His interests in Equities and Repsco were well-documented at the Ethics Committee hearing. At the time he was approached by Whitesell, Clark, and the Edzeks, respondent had already lent significant sums to Equities, and held a stock interest in the company. He was the sole shareholder of Repsco, Inc., which was the direct or indirect recipient of $40,000 of his clients' funds.

Moreover, respondent obviously had extensive knowledge of the nature of Equities business and of its tenuous financial condition. He testified before the Ethics Committee that he was aware of the company's severe cash-flow problems, which were in part a result of its inability to obtain bank financing. His own difficulty in depositing checks received from Equities should have put respondent on notice that the company had a

opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto.

questionable future. That the firm was forced to raise funds by paying 10% interest *per month* on its obligations should have reinforced respondent's knowledge that this was an inordinately risky investment.

As the record makes painfully clear, respondent chose not to make full disclosure to his clients, all of whom were financially unsophisticated individuals relying heavily on respondent for investment advice. The limited disclosures made by respondent were so misleading that they constituted independent violations of *DR* 1–102(A)(4), *DR* 2–101(A), and *DR* 2–101(B)(6), which prohibit the making of a false, fraudulent, misleading, or deceptive statement in connection with any aspect of a lawyer's engagement. We note the following excerpts from the testimony adduced at the Ethics Committee hearing:

BENEDICT [PRESENTER]: When you invested this money through Mr. Smyzer, were you aware of any chance that you might lose that money?

WHITESELL: No.

Q. Did Mr. Smyzer at any point in time advise you that he did work for Equity [sic] Holding Company?

A. No.

Q. Did he advise you that there might be some conflict of interest between his representation of Equity [sic] Holding Company and representing you as an investor in that same company?

A. No.

    \*     \*     \*     \*     \*     \*     \*     \*

BENEDICT [PRESENTER]: Do you recall if he gave you any documents for you to review that indicated his relationship with Repsco, Inc.?

CLARK: No.

Q. And you knew orally from conversations with him that he was an officer of the corporation?

A. Yes.

Q. And did Mr. Smyzer have any conversations with you in which he indicated that there is—was a potential for a conflict between his role in Repsco, Inc. and representing you as an investor in the corporation?

A. No.

    \*     \*     \*     \*     \*     \*     \*     \*

BENEDICT [PRESENTER]: Do you remember if Mr. Smyzer had any conversation with you in which he attempted to disclose the financial condition of Repsco, Inc.?

CLARK: * * * [H]e was saying that * * * they're having problems right now of things being tied up, and investigated, and something, and all that, and just be patient; that right now your money isn't coming through, but it will be in a little while.

Respondent's own testimony reveals the inadequacy of the information given to his clients:

Q. Now, what did you tell [Whitesell] with respect to the investments * * *?

A. I told her that I had made some personal investments with a company in Connecticut called Equities Holding that were paying substantially higher rates and I also told her that as with any investment that pays high interest rates there's also a risk involved [but] that I had made a personal judgment when investing funds of my own in Equities that the risk to my investment or any investment in the company would be minimal because I believed that the company was going to be successful.

▮▮ A lawyer is required to maintain the highest professional and ethical standards in his dealings with his clients. *In re Gavel*, 22 *N.J.* 248, 262 (1956). No exception to this duty exists merely because the attorney chooses to become involved in business transactions with such individuals. *In re Carlsen*, 17 *N.J.* 338, 346 (1955). As we stated in *Wolk*, "[t]his Court will no more tolerate the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer than it will outright misappropriation of funds." 82 *N.J.* at 335 (citing *In re Wilson*, 81 *N.J.* 451 (1979)). Contrary to our admonition in *Wolk*, respondent deceived his clients in order to protect his investment in a company whose financial condition was rapidly deteriorating. He also diverted large sums of those individuals' funds to a firm in which he was the lone shareholder. We agree with the DRB that respondent's flagrant abuse of the trust placed in him by his clients permits no other alternative but to strike his name from the roll of attorneys in this state.

### III

The DRB also concluded that respondent commingled funds, *DR* 9–102(A), (B)(3), (B)(4), and that the overdrafts in his trust account established knowing misappropriation of client funds in violation of *In re Wilson, supra,* 81 *N.J.* 451. In view of our

conclusion that respondent's repeated violations of *DR* 5-104(A) require imposition of our strongest sanction, we need not decide whether respondent's misuse of his trust account supports a finding of knowing misappropriation under our decision in *Wilson, supra.* In accordance with our findings above, the judgment is that respondent be disbarred.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.