874 A.2d 1130 (2005)
378 N.J. Super. 137
MILO FIELDS TRUST u/w/o Milo Fields, Plaintiffs-Respondents/Cross-Appellants,
v.
Jeffrey E. BRITZ, Sheila Britz, Professional Management Bureau, Inc., Pmb of Hackensack, L.L.C., Pmb of Union City, L.L.C. and Select Management Services, L.L.C., Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 20, 2005.
Decided June 9, 2005.
*1131 Steven Gerber, Wayne, argued the cause for appellants/cross-respondents *1132 (Adorno & Yoss, attorneys; Mr. Gerber, of counsel and on the brief; Mary Pat Gallagher, on the brief).
Joseph B. Fiorenzo, Hackensack, argued the cause for respondents/cross-appellants (Sokol, Behot & Fiorenzo, attorneys; Mr. Fiorenzo, of counsel and on the brief; Mary Anne McConeghy, on the brief).
Before Judges NEWMAN, R.B. COLEMAN and HOLSTON, JR.
The opinion of the court was delivered by
HOLSTON, JR., J.A.D.
Defendants, Jeffrey E. Britz (Britz), Sheila Britz (S.Britz), Professional Management Bureau, Inc. (PMB), PMB of Hackensack, L.L.C., (PMB of Hackensack), PMB of Union City, L.L.C. (PMB of Union City) and Select Management Services, L.L.C. (SMS), appeal and plaintiff, Milo Fields Trust u/w/o Milo Fields (the trust), cross-appeals from the March 18, 2003 final judgment of the Chancery Division entering judgment in favor of plaintiff in the amount of $170,000 plus prejudgment interest calculated from March 1, 1998 and requiring an accounting of accounts receivables attributable to the operations of PMB of Hackensack and PMB of Union City existing as of March 1, 1998. Defendants also appeal and plaintiff cross-appeals from the April 25, 2003 order denying amendment to judgment of March 18, 2003, but which modified judgment to stipulate that prejudgment interest is due to plaintiff on all accounts receivables. We affirm.
The essential facts are as follows. Britz developed and operated a series of physical therapy clinics throughout northern New Jersey. Britz and S. Britz, respectively, owned 5% and 95% of PMB, which according to Britz, managed all the business affairs of various Hudson Physical Therapy clinics (HPT), the providers of physical therapy services in North Jersey. The HPTs were operated by a New Jersey-licensed physical therapist. Defendants, PMB of Hackensack and PMB of Union City, were limited liability companies (LLCs) that were formed by PMB's comptroller on June 6, 1995, and June 15, 1995, respectively, their purpose being to bring in investors.
Gary Fields (Fields), a New York attorney, performed legal services for Britz at Britz's request on essentially a barter basis, such that in exchange for those services, Fields was given an opportunity to invest as a 20% and 19% owner, respectively, in two LLCs formed by Britz. Fields invested $31,280 in the two LLCs. He invested $10,000 in PMB of Hackensack and $21,280 in PMB of Union City. When Fields' wife, Milo Fields, became terminally ill, Fields assigned his interest to her, and those interests passed to plaintiff under her will. In anticipation of the sale in 1998 of Britz's interest in the LLCs and the sale of the assets of PMB to Select Medical of New Jersey (Select), Britz offered the trust through Fields $191,000 for the trust's interest in both LLCs. Britz had previously returned his initial combined investment of $31,280 in both LLCs and an additional $19,000 in profits to Fields. Fields, acting for the trust, refused the offer.
In December 1997, Britz met with representatives of Select with respect to the sale of PMB to Select. A February 3, 1998 letter of intent between Select and PMB provided for Select's acquisition of an 80% undivided interest in the assets of the "Mature [physical therapy] Companies" (Jersey City, Fair Lawn, Hackensack and Union City) and a 51% undivided interest in the assets of the "New Companies" (Englewood, Hasbrouck Heights, Ramsey, Ridgefield). Additionally, the *1133 companies were to retain a 20% undivided interest in the assets of the "Mature Companies" and a 49% undivided interest in the assets of the "New Companies." Thereafter, Select and the owner (S.Britz) were to form a "joint venture entity" known as "Newco" to operate the business.
In a February 11, 1998 letter to Fields, Britz advised that PMB entered into a letter of intent with Select for the "sale of 80% of the operating assets of the ... [Hackensack and Union City] facilities together with varying percentages of operating assets of the other six physical therapy facilities managed by PMB." Fields was offered $191,365 for his "present interest in the cash flow of the Hackensack and Union City facilities."
Exhibit 4 to the letter set forth how the $191,365 was calculated. The exhibit also contained an analysis of what Fields' interest would bring if not sold, that is, $239,206.40 together with "an ongoing interest in the cash flow of the remaining unsold portion (20% or 49%, as applicable), as well as an interest in the outstanding receivables existing at the close less a fee for collection and an interest in the future sale of these interests all of which are not determinable at this time."
Britz further explained his methodology in reaching his "allocation conclusions":
The transaction will involve the assets of PMB, which operates the Jersey City facility and provides management services to all eight facilities under its management contract with Hudson Physical Therapy Services, P.A. ("HPT"). I have allocated 50% of the entire purchase price to PMB (without reference to the Jersey City facility which it operates), since PMB in fact owns the facility lease (except for Ridgefield), equipment leases and owned equipment, and other operating assets of all eight locations; indeed, without the PMB management contract with HPT none of the eight locations would have any value. I have then discounted the results by 20% for the following three reasons:
1. I will pay you all cash for your interest at the closing, so that you will not be subject to the risk of only 60% downpayment and 40% payable over the following three years with interest at 6%-I will bear the full brunt of the deferral;
2. You will not be a party to the Sale Agreement and therefore will have no liability or obligation concerning any representations, warranties or other agreements made by the Seller to the Buyer, or for any ongoing indemnification responsibilities concerning litigation in which PMB is involved  PMB will bear the full brunt of that; and
3. You will see from the Letter of Intent that I am required to work for "Newco" for three years at $150,000 per year  a very, very considerable reduction in the amounts previously drawn by my wife as sole owner of PMB. In addition, it is anticipated that both my wife and I will be bound by restrictive covenants, and will not be permitted to work in this field for a period of years following the 3-year employment arrangement.
The sale by Britz to Select was consummated and SMS, a new management company, was formed to provide management services for the HPTs. No distributions were made to the trust after the sale, and this litigation ensued.
Plaintiff, in its complaint, alleged that: (1) Britz and PMB breached their fiduciary duties to plaintiff; (2) Britz engaged in breach of contract and breach of the implied covenant of good faith; (3) Britz and PMB committed fraud, unconscionable and unlawful commercial practices in violation of N.J.S.A. 56:8-2, misappropriation and *1134 conversion; racketeering in violation of N.J.S.A. 2C:41-2, and refusal to account. Plaintiff sought dissolution of PMB, PMB of Hackensack and PMB of Union City; appointment of a provisional director, custodian or special fiscal agent with respect to PMB and of a provisional manager or special fiscal agent with respect to PMB of Hackensack and PMB of Union City; imposition of a constructive trust; compensatory, treble and punitive damages, attorneys' fees, interest and an accounting. Defendants denied the material allegations of the complaint alleging seventeen separate defenses.
A bench trial was conducted between January 13, 2003, and March 5, 2003, before Judge Escala. In a written opinion issued March 18, 2003, the judge valued the trust's interest in PMB of Hackensack and PMB of Union City at $170,000 plus interest from March 1, 1998, at 7 .5% for 1998, 1999, and 2001; 7% for 2000; 8% for 2002 and 5% for 2003. The judge also ordered an accounting with respect to a calculation of the value of certain accounts receivables.
A judgment was filed on March 18, 2003. An April 25, 2003 order denied the trust's motion to amend the judgment with the exception that "prejudgment interest ... [was to be] due to Plaintiff on all accounts receivable collections calculated from Jan 1 of the year following the year of collections for that year."
The following issues are presented for our consideration:
DEFENDANTS' ISSUES
POINT I
DID THE COURT ERR BY FAILING TO RULE THAT THE TRUST'S CLAIMS WERE BARRED BY GARY FIELDS' FAILURE TO COMPLY WITH RPC 1.8(a)?
POINT II
DID THE COURT ERR IN AWARDING THE TRUST A PERCENTAGE OF THE ACCOUNTS RECEIVABLES COLLECTED SUBSEQUENT TO THE SALE OF PMB?
POINT III
DID THE COURT ERR BY FINDING THAT THE ASSETS PURCHASED BY SELECT FROM PMB INCLUDED THE LLCS?
POINT IV
DID THE COURT ERR BY FINDING THAT THE ASSIGNMENT BY GARY FIELDS TO HIS WIFE, MILO FIELDS, WITHOUT AUTHORIZATION OF THE LLC OWNERS, WAS NOT AN ISSUE?
POINT V
DID THE COURT ERR IN DENYING ADMISSION OF EVIDENCE ESTABLISHING THAT GARY FIELDS DID NOT HAVE PROSKAUER'S PERMISSION TO EXCHANGE FIELDS' LEGAL WORK FOR AN INTEREST IN BUSINESS ENTITIES AND IN FINDING THAT PROSKAUER ACQUIESCED IN FIELDS DOING SO?
POINT VI
DID THE COURT ERR BY AWARDING THE TRUST INTEREST?
PLAINTIFF'S ISSUES
POINT VII
DID THE COURT ERR BY FAILING TO AWARD THE TRUST VARIOUS FORMS OF RELIEF UNDER THE LLC ACT?
POINT VIII
DID THE COURT ERR BY FAILING TO MAKE ANY RULING ON THE TRUST'S CLAIMS FOR CONVERSION, BREACH OF FIDUCIARY DUTY, FRAUDULENT MISREPRESENTATION AND BREACH OF THE IMPLIED COVENANT OF FAIR DEALING?
*1135 Judge Escala summarized the essence of the case as follows:
[w]hat this action comes down to is this: The Fields interest was worth a certain amount of money at the time of its being sold and transferred to Select under the peculiar arrangements that transferred the Fields interest while at the same time not transferring that interest. How much that interest was worth at that time is what is to be determined by the court. Compensation to the Fields trust therefore as of that date [March 1, 1998] plus interest from that date, will resolve all claims in the complaint.
Initially, the judge ruled on defendants' arguments pertaining to the alleged RPC 1.8 violation:
[d]efendants' claim that Fields violated R.P.C. 1.8 is not supported by the proofs. It is quite apparent that Britz, a knowledgeable and experienced businessman, knew Fields was an attorney, and sought his legal expertise for which as payment he would receive an opportunity to invest modestly in an enterprise that would and did provide a handsome return on investment. It was Britz'[s] initiative to do so. Britz and his company, before this litigation never objected to Fields being the attorney. Further comment on this issue is not warranted.
The judge added that the documents that went back and forth between Fields and Britz, including those that Fields prepared which Britz never used, had "little or no relevance to the issues before the court," that is, "the value of the Fields interest in the LLCs and whether or not there was an R.P.C. violation."
As to the validity of the assignment of Fields' interest to his wife, the judge stated:
[s]uffice it to say that Britz and those running the entities were aware of the transfer of Fields' interest to his wife and acquiesced in it. In fact, after Ms. Fields['] death, the company sent Fields valuations of that interest for estate-tax reporting ... I am satisfied this is not an issue.
As to Britz's offer to buy out the trust's interest upon consummation of the PMB-Select transaction, the judge found:
[i]n order for Britz to be able to ... complete the Select transaction, he had to acquire these minority interests. He wrote to the owners of the minority interests, outlining his proposal for acquiring their shares at a price whose calculations he outlined. The three minority investors in the two clinics' LLCs other than Fields accepted Britz'[s] proposal to acquire their interests at the dollar figures he offer[ed], without question. There is no proof before the court respecting these minority owners' reaction to Britz'[s] calculations other than that these minority investors found his proposal to be acceptable. Therefore, I determine that they regarded his proposal and by inference his mathematical analysis of value as fair and reasonable. They transferred their interests to Britz on the same basic terms as he was offering Fields and which Fields rejected. Therefore I find Britz'[s] proposed buyout of minority shares to be fair and reasonable.
As to valuation, the judge determined that the formula for arriving at the Select transaction purchase price (five times the adjusted earnings of the active clinics):
created the illusion that the only "things" of value that entered into the value of the package were the LLCs themselves and that the relative values of the LLCs could be derived simply by a mathematical application of the price proportionately to the constituent LLCs. *1136 And it created the illusion that the value of minority shares in the two LL[C]s with minority interests could be derived arithmetically as well.
However, the judge concluded "that there was much more to the transaction than the LLCs alone" including "the overlay of PMB and its management of the clinics" and Britz'[s] employment agreement that contained the non-competition provision.
The judge rejected the opinion of Fuentes, plaintiff's accounting expert, because Fuentes "omitted the obvious value of the PMB element of the transaction." The judge accepted the opinion of Trugman, defendants' accounting expert, because Trugman allocated "the price paid by Select to the interests of the LLC owners by first determining and then subtracting from the price the value of PMB" and that Trugman "demonstrated that the value of PMB could be established." According to the judge, Trugman estimated the "resulting value of Fields' interest at $159,961, or a then present value of $148,540," and that Trugman came up with an alternate valuation of $192,097, which omitted a component involving estimated compensation to Britz.
The judge ultimately found that:
the value to be established will be for the entire worth of the Fields trust minority interest in the LLCs. The entire interest is deemed to have been acquired in the transaction, notwithstanding the apparent retention of an interest in a surviving new entity following the Select closing. I have no way of making such determination, and so by acquiescence of counsel I have treated this valuation as if the entire interest had been acquired at the same time, that is March 1, 1998.
The judge valued the trust's interest at $170,000 by taking the average of two valuations expressed by Trugman ($148,540 + $192,097) "rounded." To this sum, the judge added "interest at the judgment rate (7.5% for the years 1998, 1999 and 2001; 7% for 2000, 8% for 2002; and 5% for 2003) to the date the judgment is signed." Since no information pertaining to accounts receivables was produced at trial, the judge ordered defendants to provide an accounting.
The court further held that the judgment in favor of the trust "subsumes all claims and theories advanced in plaintiff's complaint" and "[a]ll of the legal theories of this case have merged into simply a determination of the value of plaintiff's minority interest in the LLCs that were essentially dissolved in the 1998 transaction."

I
Defendants contend that the trial court erred as a matter of law when it failed to rule that the trust's claims were barred by Fields' failure to comply with RPC 1.8(a). In support of this argument they urge that: (1) absent strict adherence to New Jersey's Rules of Professional Conduct regarding business transactions between attorneys and their clients, these transactions are unenforceable as a matter of law and public policy; and (2) RPC 1.8(a) applies to business transactions even when the party to the transaction is not a client.
The agreement between the Britz parties and Fields, their lawyer, constituted a business transaction between an attorney and his clients, thereby triggering the application of RPC 1.8(a), which provides:
(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

*1137 (1) the transaction and terms in which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be understood by the client;
(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel of the client's choice concerning the transaction; and
(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.
We can discern the intent of the rule by the Supreme Court's admonition in Matter of Smyzer, 108 N.J. 47, 57, 527 A.2d 857 (1987), where the court reiterated "`[t]his Court will no more tolerate the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer than it will outright misappropriation of funds.'" (quoting In re Wolk, 82 N.J. 326, 335, 413 A.2d 317 (1980)). Thus, we note that the obvious purpose of the RPC is to protect the client.
Judge Escala found no violation of RPC 1.8(a) because Britz, whom the judge characterized as "a knowledgeable and experienced businessman," affirmatively sought Fields' "legal expertise" for which Fields would be given an opportunity to invest in Britz's enterprise and because no objection was raised by Britz or his company to Fields' status as an attorney prior to the commencement of this litigation.
In Petit-Clair v. Nelson, 344 N.J.Super. 538, 542, 782 A.2d 960 (App.Div.2001), we stated:
"[A]n attorney's freedom to contract with a client is subject to the constraints of ethical considerations" and the Supreme Court's supervision. Cohen v. Radio-Elec[s] Officers Union, 146 N.J. 140, 155, 679 A.2d 1188 (1996). Any transaction between an attorney and client is "subject to close scrutiny and the burden of establishing fairness and equity of the transaction rests upon the attorney." In re Gallop, 85 N.J. 317, 322, 426 A.2d 509 (1981); In re Nichols, 95 N.J. 126, 131, 469 A.2d 494 (1984). This is because "`[a]n attorney in his relations with a client is bound to the highest degree of fidelity and good faith. The strongest influences of public policy require strict adherence to such a role of conduct.'" In re Nichols, supra, 95 N.J. at 131, 469 A.2d 494 (quoting In re Gavel, 22 N.J. 248, 262, 125 A.2d 696 (1956)). Consequently, an otherwise enforceable agreement between an attorney and client is invalid "if it runs afoul of ethical rules governing that relationship." Cohen, supra, 146 N.J. at 156, 679 A.2d 1188. In that situation, the lawyer is duty-bound to "make sure that the client understands that the lawyer's ability to give undivided loyalty may be affected and must explain carefully, clearly, and cogently why independent legal advice is required." P & M Enter[s]. v. Murray, 293 N.J.Super. 310, 314, 680 A.2d 790 (App.Div.1996) (holding that a "transaction between a lawyer and client is presumptively invalid").
Further, in Petit-Clair, we rejected the argument that RPC 1.8(a) was inapplicable because the attorney represented the corporations and not the defendants individually. We held, "[a]ll that is necessary is that the parties relate `to each other generally as attorney and client.'" Id. at 543, 782 A.2d 960 (quoting In re Silverman, 113 N.J. 193, 214, 549 A.2d 1225 (1988)).
However, a business transaction between an attorney and client is not prohibited. Although transactions between a *1138 lawyer and client are presumptively invalid, the presumption can be overcome by evidence showing full and complete disclosure of all facts known to the attorney, absolute independence of action on the part of the client, the fairness and equity of the transaction, the lack of overreaching, and the client's understanding of the importance of independent representation. P & M Enters. v. Murray, 293 N.J.Super. 310, 314, 680 A.2d 790 (App.Div.1996). Although recommended, it is not mandatory that an attorney advise his client in writing to seek independent counsel. Cohen v. Radio-Elecs Officers Union, 146 N.J. 140, 162, 679 A.2d 1188 (1996). If the attorney can demonstrate that the intent and purpose of the rule was met, the transaction should not be disturbed. P & M Enters., supra, 293 N.J.Super. at 314, 680 A.2d 790. In P & M Enterprises, we held that even if a business transaction is invalid, it is not void ab initio. Similarly, in Petit-Clair, we did not declare that the new law firm forfeited its right to payment of its fees. We merely held that the mortgage it took from the principals of the client to secure the corporation's promise of payment was not enforceable.
In this case, Britz had full and complete knowledge of all the facts regarding the structure of the investments. The investments were Britz's idea. It was Britz who approached Fields about infusing capital into clinics in Hackensack and Union City, not the other way around. In addition, Britz did not depend on Fields for the information of the LLCs. There was no interdependence of actions by Britz and Fields. The transaction is per se fair, and there was no overreaching by Fields because Fields received the same rights as all the other investors. Indeed, Fields possessed nothing more than a minority interest in the LLCs with no ability to participate in decision-making. Finally, there was no risk of biased representation. Fields did not provide any legal advice in connection with the formation of the LLCs. Britz formed the LLCs on his own or through an individual other than Fields. Britz controlled the ventures from beginning to end. In fact, he formed the LLCs unilaterally without any prior notice to or input from Fields.
"Sophisticated clients who bargain with their lawyers from positions of substantial parity are less susceptible to overreaching." Cohen, supra, 146 N.J. at 162, 679 A.2d 1188. In fact, a sophisticated client can have an advantage. Ibid. The trial court determined that Britz was/is a very sophisticated businessman. Britz also had Ray Vandenberg, Esquire, as his private counsel for some matters. Additionally, the trial court determined that Britz was not taken advantage of by Fields.
The case of DiLuglio v. Providence Auto Body, Inc., 755 A.2d 757 (R.I.2000), is analogous to the facts in this case. DiLuglio, an attorney, successfully represented Petrarca, a businessman, in connection with federal criminal charges. Id. at 761. Subsequently, Petrarca sought DiLuglio's advice in connection with his attempt to find a site for his auto body business, Providence Auto Body, Inc. (PAB). Ibid. Although Petrarca eventually found a parcel of real estate that constituted the sole asset of Waldlum Realty, Inc. (Waldlum), a closely held corporation owned by Petrarca, he could not obtain financing. DiLuglio provided $25,000 to Petrarca. Ibid. Petrarca claimed it was a loan while DiLuglio contended that the money "constituted his own startup-capital investment in both the property and in PAB, Petrarca's soon-to-be-formed corporation for his auto-body business." Id. at 761-62.
*1139 According to the court, "DiLuglio also orchestrated the somewhat convoluted means used to acquire the property." Id. at 762. The court noted that, "DiLuglio structured the Waldlum stock acquisition such that he not only became a 20 percent shareholder of Waldlum, but he also became, indirectly, a 20 percent shareholder of PAB because he caused PAB to come into its corporate existence as Waldlum's wholly owned subsidiary." Id. at 762-63.
Subsequently, in order for PAB to become a "Subchapter S" corporation, Waldlum had to divest itself of PAB's stock and did so by transferring 80% of its PAB shares to Petrarca and 20% of those shares to DiLuglio. Id. at 763. A deed prepared by DiLuglio transferred ownership of the property from Waldlum to DiLuglio and Petrarca, as respective 20% and 80% tenants in common. Ibid.
DiLuglio, having unsuccessfully demanded from Petrarca that PAB distribute more of its profits to him, instituted suit seeking PAB's dissolution, claiming "that Petrarca had breached his fiduciary duty to DiLuglio, that Petrarca had paid himself excessive salaries, had denied DiLuglio access to corporate books and records, and had misappropriated and improperly diverted corporate assets for his own benefit." Ibid.
In defense, Petrarca and PAB contended:
that DiLuglio was not the rightful owner of any PAB shares because, as Petrarca's attorney, DiLuglio had failed to disclose fully and in writing the ramifications of DiLuglio's entering into these business transactions with Petrarca while DiLuglio was also performing legal work on Petrarca's behalf. They contended that DiLuglio had breached his fiduciary obligations to Petrarca by failing to reduce their alleged agreements and his purported consent to writing and by failing to notify Petrarca that he should seek independent legal advice concerning his business arrangements and transactions with DiLuglio.
[Id. at 763-64.]
The Rhode Island Supreme Court held that DiLuglio breached his fiduciary and professional duties to PAB and Waldlum, in that he:
failed to provide full disclosure to Petrarca, in his capacity as the controlling shareholder and director of both Waldlum and PAB, of the individual and corporate parties'"differing interests" if DiLuglio were to become and remain a minority shareholder in Waldlum and if Waldlum were to become and remain PAB's sole shareholder. Moreover, he failed to obtain his corporate clients' written consent (through Petrarca, their sole director and majority shareholder) before and, in the case of PAB, after consummating these transactions.
[Id. at 769-70.]
The court also held that DiLuglio entered into business transactions with PAB and Waldlum while he performed legal services on their behalf in connection with these transactions because he took and held "a minority shareholder interest in Waldlum and then incorporate[ed] PAB as its wholly owned subsidiary in exchange for $25,000and also ... contribut[ed] his legal work, an automobile, loans, and other ancillary services...." Id. at 770.
Although the court concluded that DiLuglio breached his fiduciary duties, the record reflected that: (1) DiLuglio had not taken unfair economic advantage of Petrarca because DiLuglio's advancement of $25,000 was "a poor and a risky investment... because he received only a 20 percent equity position in return" and (2) "Petrarca eventually obtained full knowledge that DiLuglio had not merely loaned *1140 him $25,000 ... but rather had invested in Waldlum and PAB as a co-owner of these companies, and thereby obtained for himself a 20 percent equity stake in these corporations." Id. at 772.
The court discussed Petrarca's and PAB's failure to timely void DiLuglio's "arrangements":
If, upon discovering DiLuglio's 20 percent equity holding in Waldlum and upon learning that DiLuglio had structured the Waldlum acquisition such that he would end up owning not only 20 percent of Waldlum but also effectively 20 percent of PAB's shares, Petrarca had acted promptly to void these arrangements based upon DiLuglio's failure to obtain defendants' informed consent, we have little doubt but that he would have been entitled to obtain such relief notwithstanding the economic fairness of the transaction to all concerned.... Petrarca and PAB ultimately learned of the relevant facts, including DiLuglio's minority shareholding status in Waldlum and Waldlum's ownership of PAB. Yet they took no timely action to void these transactions, waiting almost six full years before asserting that the transaction was voidable based on DiLuglio's violation of his professional and fiduciary responsibilities. And they sought to do so only after DiLuglio sued to dissolve PAB for Petrarca's alleged fraud, waste, and misappropriation of assets and only after Petrarca and PAB had obtained independent legal advice and reorganized PAB as a "Subchapter S" corporation that would be directly owned, in part, by DiLuglio.
[Id. at 773 (citation omitted).]
The court concluded that equitable principles therefore undercut Petrarca's and PAB's attempt to void DiLuglio's status as PAB's shareholder:
[H]aving failed to raise this argument with the trial justice, having acquiesced repeatedly in DiLuglio's equity holdings, and having ratified otherwise voidable transactions, Petrarca and PAB have waived any claim that DiLuglio's status as an attorney for PAB entitled defendants to void his status as a PAB stockholder. Because of the economic fairness of these arrangements and Petrarca's relative sophistication and experience as a businessman, he and PAB, the corporation he controlled, therefore were estopped from seeking to negate DiLuglio's status as a shareholder so long after they should have acted to do so if they had wished to avoid these arrangements. See Olds v. Hitzemann, 220 Ind. 300, 42 N.E.2d 35, 38 (1942) (stating that "a client who, with full information, has acquiesced in or ratified a transaction with, or transfer to, his [or her] attorney cannot thereafter avoid the same"); see generally 7A C.J.S. Attorney and Client § 241 (1980) (discussing the ability of attorneys to use equitable defenses to uphold an otherwise invalid transaction with a client). Indeed, when parties sit idly on their known rights, equity will follow their example. See O'Reilly v. Town of Glocester, 621 A.2d 697, 702 (R.I.1993) (discussing the equitable defense of laches).
[Id. at 773-74.]
There can be little doubt from the record that Fields, at least while employed at his law firm, Proskauer Rose, performed legal services for PMB and prepared documents in connection with the transaction involving the physical therapy facility located in Hackensack, although Britz ultimately chose not to follow through with that arrangement. There can also be little doubt that Britz repeatedly sought Fields' legal advice. The record supports the judge's determination that Fields and *1141 Britz entered into a barter arrangement whereby Fields performed legal services without charge in exchange for an opportunity to invest in Britz's entities. Thus, Fields on one hand, and Britz and his entities on the other, surely "relate[d] `to each other generally as attorney and client.'" Petit-Clair, supra, 344 N.J.Super. at 543, 782 A.2d 960 (quoting Silverman, supra, 113 N.J. at 214, 549 A.2d 1225).
Even though Fields was not licensed to practice law in New Jersey, he engaged in the practice of law in this State because he prepared documents in connection with transactional matters. In re Jackman, 165 N.J. 580, 586, 761 A.2d 1103 (2000).[1] Assuming the applicability of RPC 1.8(a) to him,[2] the question is whether he violated the rule and, if so, whether that violation would preclude him from recovery.
Fields did not prepare writings of the type contemplated by RPC 1.8(a). However, we are satisfied that the situation presented here does not preclude Fields from recovery, for reasons similar to those in DiLuglio. The transaction and its terms did not have to be communicated to Britz because it was Britz who approached Fields with the proposal that Britz engineered, including Fields' percentages. In addition, Fields had nothing to do with the formation of the LLCs. This is in sharp contrast to the controlling actions of the attorney in DiLuglio. Therefore, "fairness" to Britz or his "consent to the transaction" are not really issues. Even assuming Fields' non-compliance with RPC 1.8(a), Britz, with full knowledge of Fields' involvement, gladly accepted Fields' free legal services and investment money without raising any ethical violation claim until the onset of this litigation. This conduct, as the Rhode Island Supreme Court found in DiLuglio, implicates the equitable principles of waiver, estoppel and ratification. DiLuglio, supra, 755 A.2d at 773-74. We, therefore, find no error in the trial court's finding of no violation of RPC 1.8(a), which would require a voiding of the transaction in issue here.

* * * * * *
[At the direction of the court, per Rule 1:36-3, the discussion of the other issues in the appeal have been omitted from the published version of the opinion.]

* * * * * *
The findings of fact contained in Judge Escala's written opinion were based on substantial credible evidence in the record. There was no abuse of discretion in the rulings made by the trial court.
Affirmed.
NOTES
[1] His unlicensed status should not affect his cause of action because he is not seeking remuneration for legal services rendered.
[2] New York has a similar rule. N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.33.