267 N.J. Super. 174 (1993)
630 A.2d 1191
PROFIT SHARING TRUST FOR MARPROWEAR CORPORATION, PLAINTIFF,
v.
LAMPF, LIPKIND, PRUPIS, PETIGROW & LABUE, P.A., DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided May 25, 1993.
*176 Glenn A. Bergenfield for plaintiff.
James F. Keegan for defendant (Bendit, Weinstock & Sharbaugh, attorneys) and Lampf, Lipkind, Prupis, Petigrow & Labue, pro se (James F. Keegan, Neil L. Prupis, Stephen H. Skoller, and Frank Magaletta, on the brief).
GOLDMAN, J.S.C.
Pending before me are various motions by the defendant, Lampf, Lipkind, Prupis, Petigrow & Labue, P.A. (hereinafter called "Lampf-Lipkind") for dismissal, judgment notwithstanding the verdict (JNOV) and for a new trial pursuant to R. 4:6-2(a), R. 4:40-2(b), and R. 4:49-1 following a jury verdict in favor of the plaintiff for $449,600.00. Except for the motion to dismiss for lack of subject matter jurisdiction, which could require a factual determination by me, the other motions now pending require that I view the facts presented at trial in the light of the jury verdict. For the motion under R. 4:40-2(b) I must accept as true all evidence and all legitimate inferences that sustain the jury verdict. Dolson v. Anastasia, 55 N.J. 2, 258 A.2d 706 (1969). In this context my role "is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Id. at 5-6, 258 A.2d 706. R. 4:49-1 sets forth a less arduous standard that requires me to decide after giving:

*177 due regard to the opportunity of the jury to pass upon the credibility of the witnesses, whether it clearly and convincingly appears that there was a miscarriage of justice under the law. R. 4:49-1
The question is whether a reasonable jury could have found liability in favor of the plaintiff Trust based upon the evidence. The following facts are cast in that light.
Plaintiff is the profit sharing trust for Marprowear Corporation. This trust shall be called the "Trust" while the corporate entity, the employer, shall be called "Marprowear." The Trust is a benefit plan and trust organized under 29 U.S.C.A. §§ 1001, et seq. (hereinafter called "ERISA"). Two trustees were the principal witnesses at trial along with their experts.
The defendant, Lampf-Lipkind, is a law firm practicing in West Orange, New Jersey, specializing in tax and pension benefit law. Marprowear first hired Lampf-Lipkind in the 1970s when the Trust had a disagreement with the Internal Revenue Service in connection with a complex real estate transaction. Because legal fees of an ERISA trust are tax deductible to the employer, Marprowear was the entity that actually hired Lampf-Lipkind.
For the past decade, if not longer, Lampf-Lipkind's legal representation extended not only to tax work involving the Trust, but also to more generalized legal services to Marprowear and its individual shareholders. The evidence disclosed no other employees of Marprowear, showed that Marprowear was a closely held corporation, and revealed that its shareholders, its employees and the beneficiaries of the Trust were essentially the same people or members of the same family. In addition, Lampf-Lipkind drafted complex buy-sell agreements for Marprowear and its principals as part of planning for the contingencies of death or disability.
In 1982 Lampf-Lipkind borrowed money from the Trust or Marprowear. The loan was substantial and the interest rate was high, reflecting the then current interest rate environment. This transaction was not alleged to be wrongful because at the time, the relevant disciplinary rule, DR 5-104(A), did not require disclosures of conflicts nor consents in writing.
*178 Over time Lampf-Lipkind became, in effect, general counsel for Marprowear. They handled real estate matters for Marprowear, wills and trusts for its principals and family members, and, of course, all the plan amendments and other legal work related to the Trust. Because of the constant stream of changes in laws and regulations, plan amendments were required periodically. Lampf-Lipkind would advise the Trust about these plan amendments. Typically, because of the complex and arcane nature of legislative and regulatory requirements, Lampf-Lipkind would prepare the necessary papers and the trustees would execute them routinely and without question.
Sometime in 1985, a member of Lampf-Lipkind mentioned the law firm's involvement with Southeastern Insurance Group (hereinafter "SIG"). Lampf-Lipkind asked if Marprowear might be interested in lending money to SIG. No one followed-up on this suggestion. Later, however, in early 1986, Prupis, on behalf of Lampf-Lipkind[1], approached the Trust about making an investment in SIG. Prupis explained that this would be an appropriate, safe and conservative investment. Like Marprowear, Prupis claimed that SIG would be run as a family business with the direct involvement of Prupis and others from Lampf-Lipkind. They could thus protect and watch over the Trust's investment. Prupis revealed that Lampf-Lipkind partners were investing their own money in SIG, thus proving their confidence in its success. Based upon these representations and without benefit of any independent counsel or other advice, the Trust invested some $449,600.00 in a complex package of stock, debentures and other securities that comprised two "units" of an investment in SIG.
While the Trust admits the delivery of a Confidential Private Placement Memorandum (the "PPM"), all of the trustees claim that they did not read it because they relied upon Lampf-Lipkind *179 for legal advice and they considered the PPM a "legal" document. Once, Prupis came to Marprowear's offices and explained some financial projections in the PPM to one or more trustees who were present, but never revealed the conflicts of interest nor gave the Trust notice that it should obtain independent counsel. There was no doubt that everyone knew that Lampf-Lipkind was involved with SIG and in that sense a "conflict" was known, but this "conflict" was used by Lampf-Lipkind as a selling point. More importantly, the potential for or actuality of differing and conflicting interests was never disclosed.
The PPM, while not read by the Trustees before their investment, was allowed in evidence. The PPM was critical in two respects. First, Lampf-Lipkind claimed that it contained the required disclosures under R.P.C. 1.8, was read by the trustees, and fulfilled both its ethical and legal duties. Second, the Trust claimed that the PPM showed that the eventual collapse was a foreseeable risk known to Lampf-Lipkind. The PPM revealed the following:
1. On Page 1, in bold print and all capitals, the PPM warned:
POTENTIAL INVESTORS SHOULD THOROUGHLY CONSIDER THIS OFFERING MEMORANDUM AND THEIR PERSONAL TAX, FINANCIAL AND OTHER CIRCUMSTANCES PRIOR TO PURCHASING UNITS. THE PURCHASE OF UNITS IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY OF THEIR INVESTMENT AND WHO UNDERSTAND AND CAN AFFORD THE HIGH FINANCIAL AND OTHER RISKS OF SUCH AN INVESTMENT INCLUDING THE RISK OF LOSING THEIR ENTIRE INVESTMENT.
2. Also on Page 1 and in bold capitals was the following warning:
INVESTORS SHOULD CONSULT THEIR OWN LEGAL COUNSEL, ACCOUNTANTS AND OTHER PROFESSIONAL ADVISORS AS TO LEGAL, TAX, INVESTMENT AND OTHER RELATED MATTERS CONCERNING AN INVESTMENT IN THE UNITS.
3. On Page 10, the PPM warned that only those who could bear the loss of their entire investment should purchase units.
4. On Pages 12 through 17, the PPM summarized sixteen risk factors and warned potential investors of the risk of losing their *180 entire investment. Among the risk factors identified were: a limited operating history; problems in obtaining reinsurance; high operating expenses; dependency on an outside sales force; risks of underwriting losses; risks of inadequate investment income; risks of government regulation; risks of concentration of business both geographically and by product line; risks that the units were overpriced and had no public market; and financial risks in general including the intention not to pay dividends.
5. At many places throughout the fifty-eight page (excluding exhibits) PPM, it was disclosed that Prupis and Lipkind were directors of SIG, that Prupis' brother was president of the company, that Prupis and others would be released from obligations if the offering were successful, that Lampf-Lipkind leased space to SIG, and that Lampf-Lipkind had been and would continue to be attorneys for SIG.
Lampf-Lipkind revealed neither these conflicts nor these risks to the Trust verbally or in writing. Had the Trust been so warned it would not have made the investment of $449,600.00.
A year or two later, SIG began having financial problems, and finally filed for bankruptcy. A series of meetings was held at which Prupis and others from Lampf-Lipkind assured the Trust and other investors that things were under control. By 1991 the "units" purchased by the Trust were conceded by Lampf-Lipkind to be worthless. There was no evidence submitted as to the specific cause or reason for the subsequent failure of SIG. At oral argument on this motion, counsel for the Trust admitted that he had submitted no such proof.
The expert testimony was in sharp contrast. Bennet Wasserman, Esq., the Trust's expert, claimed that Lampf-Lipkind's conduct was a clear violation of R.P.C. 1.8(a)[2] because Lampf-Lipkind *181 failed to advise the Trust in writing of both the conflict of interest and the need to get independent counsel. Moreover, there was no evidence of the Trust's consent to the conflict in writing. Lastly, Wasserman claimed that R.P.C. 1.8(b)[3] was violated because Lampf-Lipkind used its knowledge of the Trust's financial wealth as a basis for targeting the Trust as a potential investor. Wasserman did not render any opinion on proximate causation.
Edward Wacks, Esq., the expert for Lampf-Lipkind,[4] agreed that R.P.C. 1.8 governed but he opined that the warnings contained in the PPM were sufficient both as to form, i.e., that the notice be in writing, and as to content. Wasserman disagreed, claiming that the information mentioned only within a lengthy offering statement was not a meaningful disclosure; his understanding of R.P.C. 1.8 required a separate, understandable, written document. Moreover, Wasserman said that the statement "INVESTORS SHOULD CONSULT THEIR OWN LEGAL COUNSEL" was not sufficient to advise the Trust to consult independent legal counsel because from the Trust's perspective, Lampf-Lipkind was "their own legal counsel."
Wasserman's opinion is better supported by case law. In Matter of Smyzer, 108 N.J. 47, 527 A.2d 857 (1987), the Court disbarred an attorney who was approached by his clients for *182 investment advice and, in response, encouraged them to invest in businesses in which the lawyer had an interest. The Court said:
We have consistently emphasized that an attorney should approach such business arrangements with caution, and must carefully explain to his client the need for independent legal advice. Id. at 54, 527 A.2d 857.
Quoting In re Wolk, 82 N.J. 326, at 333, 413 A.2d 317 (1980), in part, the Court in Smyzer said:
When a lawyer has a personal stake in a business deal, he must see to it that his client understands that his objectivity and his ability to give his client his undivided loyalty may be affected.... Nor will a passing suggestion that the client consult a second attorney discharge the lawyer's duty when he and the client have differing interests. [citations omitted]. In view of the trust placed in an attorney by his clients and the attorney's often superior expertise in complicated financial matters, a lawyer must take every possible precaution in ensuring that his client is fully aware of the need for independent and objective advice. [108 N.J. at 54-55, 527 A.2d 857]
After the bankruptcy filing, the Trust was contacted and attended a meeting arranged by other investors and the law firm of Sills, Cummis, Zuckerman, Radin, Tischman, Epstein and Gross, P.A., hereafter called "Sills Cummis." At this meeting, Sills Cummis advised the Trust and other investors about a potential legal action against SIG, Lampf-Lipkind, accountants and others. The Trust was asked to join in for a fee of $2,500.00. It did so, but this was the last contact it had with the law firm until the case was completed. The federal lawsuit apparently alleged violations of securities laws on behalf of the Trust and twenty other plaintiffs. The trustees were not interviewed, did not provide facts to Sills, Cummis and were not informed nor aware of the progress of the federal lawsuit. The suit was later dismissed by Judge Lechner. Insurance Consultants of America v. Southeastern Insurance Group, et al., 746 F. Supp. 390 (D.N.J. 1990).
In 1990, in an unrelated matter, Lampf-Lipkind sued Marprowear and the Trust for unpaid legal fees in the Special Civil Part. This lawsuit followed as a counterclaim in that suit. For procedural reasons unclear to me, a default judgment was entered in the legal fee action but this legal malpractice action went on, with the counter-claimant denominated as the plaintiff.

*183 Subject Matter Jurisdiction

Lampf-Lipkind moves to dismiss alleging that this court lacks subject matter jurisdiction. It is axiomatic that such a motion is always timely as this is a defense that can never be waived. Gilbert v. Gladden, 87 N.J. 275, 432 A.2d 1351 (1981).
After the case was assigned to me for trial, this motion was made first orally and then with written support, in each instance without giving the Trust a fair opportunity to respond. I refused to decide this complex issue in that circumstance and advised the parties that I would deny these applications without prejudice but permit them to be raised after trial in the event of a verdict adverse to Lampf-Lipkind, pursuant to R. 4:6-3 which provides as follows:
Defenses (a) (e) and (f) in R. 4:6-2, whether made in an answer or by motion, shall be heard and determined before trial on application of any party, unless the court for good cause orders that the hearing and determination thereof be deferred until the trial.
It is clear that justice would have better been served if these and the other applications had been made prior to trial. I cannot help but wonder whether or not the decision by Lampf-Lipkind to represent itself throughout this litigation, contributed to this decision and others which were clearly detrimental to its case. For example, Lampf-Lipkind did not even retain an expert on its defense until after the case was assigned out to me for trial. I had to delay trial to allow plaintiff's counsel the opportunity to depose this new expert.
In this motion, Lampf-Lipkind contends quite simply that because this lawsuit relates to an ERISA trust, only a federal court has jurisdiction. In its most extreme form, the literal language of 29 U.S.C.A. § 1132(a) narrowly defines who can bring a lawsuit under ERISA as follows:
(a) Persons empowered to bring a civil action
A civil action may be brought 
(1) by a participant or beneficiary 
(A) for the relief provided for in subsection (c) of this section, or

*184 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;
(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;
(4) by the Secretary [for relief not relevant here]
This statute goes on to provide, under 29 U.S.C.A. § 1132(e) that exclusive jurisdiction lies in federal courts.
(e) Jurisdiction
(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, or fiduciary. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section.
(2) When an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.
Finally, ERISA mandates that it supersede all state laws relating to plans under its purview. 29 U.S.C.A. § 1144(a) provides as follows:
Except as provided in subsection (b) of this section, the provisions of this subchapter shall supersede any and all state laws insofar as they relate to any employee benefit plan ...
Lampf-Lipkind's logic is simple. If the Trust's claim or the state law cause of action is found to "relate to" an employee benefit plan, it is preempted under ERISA. Further, Lampf-Lipkind points out that the existence of an ERISA remedy for the same conduct, while not essential for its claim, is further evidence that the underlying state law claim relates to ERISA and is thus preempted.
Lampf-Lipkind correctly points out that the existence of an alternative ERISA remedy is not essential. If preemption applies, there might yet be no federal remedy at all, in which case *185 the purported wrong would be without remedy. But see Southern Cal. Meat Cutters Unions & Food Employers Pension Trust Fund v. Investors Research Co., 687 F. Supp. 506 (C.D.Cal. 1988) and Munoz v. Prudential Ins. Co. of Am., 633 F. Supp. 564 (D.Colo. 1986) (lack of a remedy under ERISA is a factor militating against Congressional intent to preempt.)
As proof that the Trust's claims "relate to" an employee benefit plan, Lampf-Lipkind points to several factors. First, the Trust is a plan governed by ERISA. This is undisputed. Second, Lampf-Lipkind was charged with conduct actionable under ERISA when performed by a "fiduciary," defined in 29 U.S.C.A. § 1002(21)(A), or a "party in interest," defined in 29 U.S.C.A. § 1002(14)(A), which it claims it must be deemed to be if the Trust's allegation were believed by the jury.
Lampf-Lipkind's claim is that since ERISA intended to regulate all conduct between a fiduciary or a party-in-interest and an ERISA plan, any actions between such entities are preempted. This idea is buttressed by the provisions of 29 U.S.C.A. § 1132(e), which provide for exclusive federal jurisdiction for claims relating to a plan brought by a fiduciary or other listed party. The logical conclusion of such a claim would require that a fiduciary suing an ERISA plan for reimbursement for a $25.00 expense would be unable to sue in small claims court but would be required to make a federal case of it, quite literally. Similarly if an ERISA plan wanted to recoup an alleged $25.00 overcharge by a fiduciary or party-in-interest. The very statement of such a conclusion evidences its absurdity. The literal language of the statute does not require such an absurd result either. What Lampf-Lipkind misses in their argument is that 29 U.S.C.A. § 1132(e) only applies to "civil actions under this subchapter." It does not apply to every civil action merely because one of the parties happens to be related to an ERISA plan.
There are two leading recent United States Supreme Court cases particularly relevant to the issues here. Mackey v. Lanier Collections Agency, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 *186 (1988), held that one Georgia statute that specifically and explicitly barred garnishment of ERISA employee benefit program was preempted. On the other hand, Georgia's general garnishment statute was not preempted and allowed garnishment of certain plan benefits.
At first blush it may seem strange that the Georgia law designed to coordinate with and support ERISA objectives was deemed preempted while the Georgia law that arguably helped in taking ERISA benefits from beneficiaries was upheld. In truth, the Supreme Court's analysis is well reasoned and helpful here particularly.
The distinction between the two Georgia statutes is simple. The preempted statute specifically relates to ERISA plans while the statute not preempted is merely a general garnishment statute unrelated to any benefit plan. In Mackey, the Supreme Court simply held that merely because a garnishment sought funds otherwise payable to a beneficiary under an ERISA plan did not preempt it. There was no dispute but that ERISA explicitly bars garnishment of ERISA pension benefit plans but not ERISA welfare benefit plans.
One aspect of the decision in Mackey is of particular interest. The Supreme Court specifically noted the provisions of 19 U.S.C.A. § 1132(d)(1), the so-called "sue and be sued" clause. That provision states: "An employee benefit plan may sue or be sued under this subchapter as an entity ..." This is in contrast to the other subsections of 19 U.S.C.A. § 1132, which do not include ERISA plans as proper parties to any claim relating to or arising under ERISA. Thus, if every claim affecting or involving ERISA plans were preempted, there would be no claim in which an ERISA plan itself could be a party.
Mackey gave meaning to the "sue and be sued" provision of ERISA by concluding that:
ERISA plans may be sued in a second type of civil action, as well. These cases  lawsuits against ERISA plans for run-of-the-mill state-law claims such as unpaid *187 rent, failure to pay creditors, or even torts committed by an ERISA plan  are relatively commonplace.
Mackey at fn. 8, identified some examples. Morris v. Local 804 Welfare Fund, 116 Misc.2d 234, 455 N.Y.S.2d 517 (Civ.Ct. 1982) (landlord sued ERISA plan for unpaid rent); Luxemberg v. Hotel & Restaurant Emp., 91 Misc.2d 930, 398 N.Y.S.2d 589 (Sup.Ct. 1977) (attorney sued ERISA plan for unpaid legal fees); Abotreka v. Alston Tobacco, 288 S.C. 122, 341 S.E.2d 622 (S.C. 1985) (doctor obtained judgment for libel against ERISA plan when the plan issued a memorandum urging its beneficiaries to avoid using the plaintiff doctor). Other cases are more similar to the case sub judice. Duffy v. Cavalier, 215 Cal. App.3d 1517, 264 Cal. Rptr. 740 (1989) (claim against stockbroker for breach of his fiduciary duty in trading ERISA plan's assets was held not preempted because lawsuit was nothing more nor less than the ordinary one against a broker by its customer); Sappington v. Covington, 108 N.M. 155, 768 P.2d 354 (Ct.App. 1968), cert. denied, 108 N.M. 115, 767 P.2d 354, cert. denied, 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1021 (1989) (claim against insurance agents for negligently picking insolvent carrier was not preempted because the alleged wrongful conduct had nothing to do with the status of plaintiff as ERISA plan and there was no risk of depletion of ERISA funds). A final example is the defendant's claim here, which began as a state court claim for legal fees against the Trust. The Trust's malpractice claim began as a counterclaim.
The meaning of the "sue or be sued" provision was further explained by Pressman Unions Fund v. Continental Assur. Co., 700 F.2d 889 (2d Cir.1983). There a complaint brought by an ERISA plan was properly dismissed because the plan, qua plan, is not named as a possible plaintiff in 29 U.S.C.A. § 1132(a) to (c). Explaining the meaning of 29 U.S.C.A. § 1132(d)(1), the court said:
Affording [ERISA] plans the power to sue does not, however, imply that they may bring actions under ERISA; it merely authorizes suits to be brought by funds in other situations where there would properly be jurisdiction. For example, if a fund in other situations became involved in a contract dispute, and wished to pursue a *188 state law contract claim, [U.S.C.A.] § 1132(d)(1) would allow the fund to bring such an action in its own name.
There is no reason that a state based claim sounding in tort, like a legal malpractice action, should be treated any differently.
The other Supreme Court case and the one primarily relied upon by Lampf-Lipkind is Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), where an employee brought a wrongful discharge action against his employer alleging that the principal reason for his firing was his employer's desire to avoid making contributions to a pension fund. Because "[t]he Texas cause of action makes specific reference to, and indeed is premised on, the existence of a pension plan," the cause of action was preempted. 498 U.S. at 140, 111 S.Ct. at 483, 112 L.Ed.2d at 484. In order for the plaintiff to prove his case he had to plead and prove that an ERISA plan existed and that his employer had a "pension-defeating" motive in firing him. 498 U.S. at 141, 111 S.Ct. at 484, 112 L.Ed.2d at 485.
While the United States Supreme Court cases may seem inconsistent, they are reconcilable. The difference is that in Lanier, the state law was one of general application and the use of the state law had nothing to do with the fact that an ERISA plan was involved. The ERISA plan could have been a trust unrelated to employment or any other fund. On the other hand in Ingersoll-Rand Co. v. McClendon, supra, the existence of an employment plan was essential to the cause of action.
To be fair, the law is not all that clear. ERISA preemption has been described as a "morass." Capital Mercury Shirt Corp. v. Employees Reinsurance Corp., 749 F. Supp. 926, 929 (W.D.Ark. 1990). Its preemption provision has been described as the "most expansive preemption clause found in any federal statute." Conison, The Federal Common Law of ERISA Plan Attorneys, 41 Syracuse L.Rev. 1049, 1083 (1990). Another court more colorfully described ERISA as a "black hole" that often "swallows up garden variety claims." Jordan v. Reliable Life Ins. Co., 716 F. Supp. 582, 583 (N.D.Ala. 1989) mod. 922 F.2d 732 (11th Cir.1991).
*189 I must rely upon sensible policy, what I perceive as Congressional intent, and Third Circuit precedent. An important case that helps me out of this "morass" and "black hole" is Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse, 879 F.2d 1146 (3d Cir.1989). In that case ERISA plan trustees alleged that their accountants failed to uncover a $1 million fraud and pled four causes of action: 1. violation of duties imposed on ERISA fiduciaries; 2. implied breach of ERISA duties; 3. state law breach of contract; and 4. state law negligence. Dismissal was affirmed on a finding that the accountants were not fiduciaries and that no jurisdiction thus existed. In sweeping language, albeit dicta, the Third Circuit explained:
We feel that professional malpractice actions brought by a plan are directly analogous to the situation in Mackey, and that, in the absence of an explicit corresponding provision in ERISA allowing a professional malpractice cause of action, Congress did not intend to preempt a whole panoply of state law in this area. Thus, we conclude that ERISA does not generally preempt state professional malpractice actions. 879 F.2d at 1151.
The state law liability of defendant Price Waterhouse in Painters, supra, would not have turned upon whether the plaintiff there was an ERISA plan. It could just as easily have been a testamentary trust. Similarly here. If plaintiff had been individuals who had funded trusts for their estate plans, or had been any other entity who had been a client of Lampf-Lipkind, the cause of action and the result would have been the same. The only relationship to ERISA is that the investing entity happens to be governed by ERISA. That simple fact is not enough to preempt a whole body of state law. While here the plaintiff was the plan itself, and any recovery will belong to the plan, this is insufficient for the cause of action to "relate to" the plan.
At oral argument Lampf-Lipkind's counsel admitted that even where a fiduciary is involved, the claim is not preempted by ERISA if it is the so-called garden variety state law claim. Were I required to make a finding of fact on the issue as defendant's status as a fiduciary, I would have no doubt but to conclude that Lampf-Lipkind was not a fiduciary as defined by ERISA. It neither controlled the plan nor was paid a fee for investment *190 advice. Except for the conduct here found wrongful by the jury; Lampf-Lipkind were the Trust's lawyers and nothing more.
The Trust's claim here is really nothing more nor less than a garden variety, or run-of-the-mill, legal malpractice claim. There is neither preemption by ERISA nor exclusive jurisdiction in the federal judiciary. Lampf-Lipkind's motion to dismiss under R. 4:6-2(a) is denied.

Judicial Estoppel
Lampf-Lipkind renews its motion for JNOV based upon its claim that the doctrine of judicial estoppel should have barred the Trust's lawsuit. Lampf-Lipkind urges that because the Trust claimed in the federal lawsuit that it had relied upon the PPM and had not relied upon Lampf-Lipkind's oral representations, Lampf-Lipkind's failure to warn of the conflict, or the failure to advise the securing of independent legal advice, it should be barred from so claiming here.
Lampf-Lipkind relies largely upon Levin v. Robinson, Wayne & LaSala, 246 N.J. Super. 167, 586 A.2d 1348 (Law Div. 1990). There the plaintiff, a lawyer, had claimed in a prior divorce action that he had received all to which he was entitled from his former law firm partners. After settling his divorce on that basis, he sued his former partners claiming more. The court refused to countenance such duplicity and held that judicial estoppel precluded the plaintiff from claiming that he was entitled to more from his partners when he had denied such a claim in his divorce. Id. at 180, 586 A.2d 1348.
The Trust contends that when the context is considered and contrasted with the facts in Levin, my equitable powers, which form the basis for the doctrine of judicial estoppel, reaffirm the correctness of my ruling. I held that the evidence of the prior position of the Trust would not judicially estop them from asserting a contrary position, but that their prior position asserted in the *191 federal lawsuit could be presented to the jury under Evid.R. 63(8), which provides:
Rule 63(8). Authorized and Adoptive Admissions
A statement is admissible against a party (a) if it was made by a person authorized by the party to make a statement or statements concerning the subject matter of the statement, or (b) if the party with knowledge of the content of the statement has, by words or other conduct, manifested his adoption of it or his belief in its truth.
I found that Sills Cummis was authorized to make "statements concerning the subject matter of the statement." This means that even if Sills Cummis did not have the explicit authority to make this statement, its general authority to bind the client in litigation allowed Lampf-Lipkind to use the Sills Cummis statement.
The Trust correctly points out that it was only one of twenty clients. The Trust was never interviewed. The comments that Lampf-Lipkind relies upon to form the basis of judicial estoppel were comments of counsel, not a party. Lampf-Lipkind correctly points out that comments of counsel can form the basis for judicial estoppel. Levin, supra, at 180, 586 A.2d 1348. Nonetheless, from an equitable perspective, that a comment was made by counsel without consultation with the client is a factor to consider.
The Sills Cummis comments deserve further scrutiny. The representations were qualified. When counsel was asked whether his clients, referring to all twenty of them, relied upon Lampf-Lipkind oral representations, he said "in my view" it would not have made a difference. When asked if his clients, again all twenty, thought it was a "no risk" situation based upon what they had been told, he said, "I would not have said that so I didn't."
Thus, when viewed as a whole, the correctness of my ruling at trial is evident. It would have been inequitable to have barred this line of proof altogether, yet it would also have been inequitable not to allow Lampf-Lipkind to use statements of the Trust's counsel in the federal action. I also allowed Lampf-Lipkind to introduce portions of the Amended Complaint in the federal action *192 even though it contained self-contradictory facts and alternative pleadings. Lampf-Lipkind vigorously used these "admissions," but the jury did not find as Lampf-Lipkind had hoped. There is no basis here for a new trial and this application is denied.

Proximate cause and damages
Lampf-Lipkind asserts that the Trust failed to establish that the claimed malpractice was a proximate cause of damages. Relying primarily on Lamb v. Barbour, 188 N.J. Super. 6, 455 A.2d 1122 (App.Div. 1982), certif. den. 93 N.J. 297, 460 A.2d 693 (1983), this is Lampf-Lipkind's most serious claim of error and is one that has substantial merit.
In Lamb v. Barbour, supra, the Appellate Division reversed a bench trial finding of legal malpractice. Barry Lamb, a twenty-three year old high school graduate with limited experience, bought all the capital stock of a 100-employee baking company grossing over a million dollars a year. Two months later the business failed and Lamb sued Barbour, his lawyer, claiming a wide range of wrongdoing including the failure to provide advice and guidance. Lamb alleged that Barbour should have told him that his limited experience did not equip him to manage an enterprise the size of the one he had bought. Lamb claimed that Barbour knew this and should have told Lamb that he was simply in over his head.
Lamb and Barbour both knew that the business had serious cash flow problems. Lamb claimed that Barbour should have warned him to be skeptical of the sellers' claims of "unreported" income to offset this cash flow shortage and should have warned Lamb of the tax dangers even if these claims were accurate. Finally, Lamb claimed that Barbour failed to conduct the proper searches, failed to negotiate the contract properly, and failed to "enlighten his clients as to the meaning of the documents."
The key issue on appeal was not whether Barbour committed malpractice but whether the assumed malpractice was proximately connected to the claim of damages. The Appellate Division found *193 that, using the standard appropriate for the review of bench trial findings,[5] Lamb failed to show that he would have not gone through with the deal even if all of the attorney derelictions he claimed had not occurred. The opinion, pointing to Lamb's total investment in this million-dollar business of only $4,000.00, doubted whether any warnings could have dissuaded him. Anyhow, Lamb never claimed that he would have done otherwise; he merely asserted that Barbour's failures deprived him of the opportunity to make an informed decision.
In contrast with the present matter, the Trust explicitly claimed what Lamb did not  that had it been properly noticed, it would not have made the investment. Moreover, in Lamb, once the investment was made, it was Lamb who controlled the business. Here once the Trust made its investment, it was Lampf-Lipkind as SIG's counsel, with two of its partners on SIG's board, that controlled the business.
Lampf-Lipkind also claims that just as Lamb never proved why his business failed, the Trust never proved why SIG failed. Even if that were true, it is equally true that Lampf-Lipkind never explained why SIG failed, or that the failure was not caused by a reason admittedly foreseeable by its inclusion in the PPM as a known risk.
I put this issue squarely to the jury as follows:[6]
Now if you find that Marprowear has sustained its burden of proof and satisfied you that Lampf-Lipkind was negligent, that still does not end the inquiry. Next you must determine whether that negligence was a proximate cause of the damages Marprowear alleges to have sustained, that is the loss of their investment in Southeastern Insurance Group, which we have all called SIG.
In this regard, Lampf-Lipkind's conduct can be considered a proximate cause of Marprowear's loss or damage if you find that it was a substantial factor in causing *194 that loss or damage. It need not be the only cause. It must be a cause that naturally and probably led to and might have been expected to produce the loss complained of. Any number of causes and effects may intervene between the negligent act and the final loss. If those intervening effects were foreseeable at the time of the negligent act, the last result as well as the first is considered as a proximate result of the first wrongful cause. If you recall, I repeatedly advised you that you could not consider events after 1986 as constituting negligence. The only reason Marprowear sought to bring to your attention the post 1986 events was to show that they were foreseeable in 1986. But it is 1986 that counts as far as fact finding by you is concerned.
Here I am beginning to enter dangerous waters I have tried to avoid. I must discuss some facts. I do so only because I do not believe that I can fairly explain the law to you without some reference to the facts of this case. On the other hand, I need you to understand that my memory of the facts is no more valid that those of the attorneys who argued to you in their summations and further that I do not intend to show any favoritism to one side or another. Believe me, if I wanted to show favoritism I would have no hesitancy in telling you explicitly. With that caution in mind, let me continue.
Now Lampf-Lipkind contends that even if you found them negligent, their negligence was not a proximate cause of Marprowear's injuries. Their claim is based on at least three ideas. First, Lampf-Lipkind claims that it was not their failure, if any, to advise Marprowear of the conflict in interest that led to the investment. They have argued that this was Marprowear's investment decision, that Marprowear knew full well of Lampf-Lipkind's involvement with SIG and that even if they had made all the disclosures suggested by Marprowear's expert, Marprowear would have made the investment. Thus they argue that their alleged negligence, the alleged failure to abide by R.P.C. 1.8, was not a proximate cause of the loss.
Lampf-Lipkind also claims that the cause of the loss was not anything that happened at or about the time of the original investment. Marprowear did not, Lampf-Lipkind claims, rely upon anything Lampf-Lipkind said or did in their capacity as attorneys but rather relied upon their own evaluation of the PPM. Instead Lampf-Lipkind claims that any loss or damage was due to intervening problems with SIG that occurred years later which had nothing to do with its alleged wrongful act in 1986. On the other hand Marprowear claims that they would not have made the investment if they had been provided the notices they claim were required under R.P.C. 1.8 and further that the very losses that occurred were foreseeable at the time of the original investment.
Concerning Marprowear's claim that it relied upon Lampf-Lipkind, Marprowear must show that it did not intentionally close its eyes and refuse to investigate, concerning the circumstances in disregard of known risks or risks so obvious that it must be taken to have been aware of them and that these risks were such that it was probable that damage might follow.
Moreover a party, like Marprowear, which claims that it acted based upon its unawareness of a conflict of interest with its attorney, must show that its unawareness was justified in the circumstances. Given all the facts as you find *195 them actually known to Marprowear, the situation must have been such as to have made it reasonable for Marprowear, considering the circumstances and their intelligence, experience and knowledge to have accepted the alleged entreaties of Lampf-Lipkind without any independent inquiry or investigation. Marprowear says that their reliance was reasonable. Lampf-Lipkind says that Marprowear admits to knowing enough information about Lampf-Lipkind's relationships that should have served as a danger signal and a red light to any normal person of Marprowear's intelligence and experience.
Third, Lampf-Lipkind claims that Marprowear's loss, if any, is being sought for allegedly bad investment advice and not because Lampf-Lipkind was negligent in providing legal services. The law does not recognize a claim for bad investment advice against lawyers, so if that is what you find at fault with Lampf-Lipkind that caused the loss, then there is no liability. Marprowear claims, however, that it is not claiming bad investment advice, only that the losses were foreseeable and thus within the scope of what was proximately caused by Lampf-Lipkind's alleged violation of the proper standard of care. The key here is that the mere coincidence of negligence and loss does not necessarily imply a causal connection but that Marprowear must satisfy you that Lampf-Lipkind's negligence was a proximate cause of the loss or damage they complain of.
Moreover, I even offered the jury the opportunity to find malpractice with only nominal damages, over the Trust's objection.
If you find that Marprowear is entitled to a verdict according to the law as I have advised and considering the facts as you find them, but you do not find that the evidence is sufficient to show Marprowear's damages in any substantial quantifiable amount, then you may return a verdict for the Marprowear and fix the amount of compensatory damages in a nominal sum such as $1.00.
The jury found that the risk of loss of the entire investment was foreseeable. The PPM so stated. The units in SIG were not marketable. The PPM so stated. The financial management of SIG was inexperienced and the financial statements were unreliable. The PPM so stated. The business losses of SIG were foreseeable. The PPM so stated. I might well have found differently if I were a juror but I am not. On one hand, the time between the investment and the first bankruptcy filing was substantial so that several intervening causes could have occurred. On the other hand, the investment had no public market, was thus illiquid, and the Trust had no control over or knowledge of what was going on within SIG. The same cannot be said of Lampf-Lipkind. Finally, Lampf-Lipkind never presented evidence of any such intervening causes. It surely cannot be said that imposing *196 liability on Lampf-Lipkind under these facts is beyond the pale.
If proximate cause is ultimately a question of fairness and policy, imposing liability on these facts is both fair and good policy. Lawyers who fail to inform clients of their own interests, fail to advise clients to seek other counsel, unabashedly sell their clients the notion that an investment with them or their colleagues is a good and safe one, and use their clients as sources of investment funds, must accept responsibility for the outcome. Lawyers may not burrow their way into their clients' confidences and then exploit those confidences for their own ends. This is the law in New Jersey.
This Court will no more tolerate the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer than it will outright misappropriation of funds. In re Wolk, supra, at 355, 413 A.2d 317, citing In re Wilson, 81 N.J. 451, 409 A.2d 1153 (1979).
The Rules of Professional Conduct bar such conduct. Such conduct is reprehensible and foreseeable damages are proper, if so found by the jury. Here the PPM provides a convenient yardstick as to the foreseeable consequences. While, given their own large investment in SIG, there is little doubt but that Lampf-Lipkind honestly believed, as did the attorney in In re Smyzer, supra, at 57, 527 A.2d 857, that the investment was a good one, there is also little doubt that they understood the risks. Risky investments are not barred; they are essential to our economic system. Lawyers, however, cannot use their clients to bankroll such risks. As Chief Justice Beasley, in Crater v. Binninger, 33 N.J.L. 513, at 518 (E. & A. 1869) stated:
The test is, that those results are proximate which the wrong-doer, from his position, must have contemplated as the probable consequence of his fraud or breach of contract.
Counsel have suggested analogies from the legal arena of securities fraud, but these cases are not consistent. Contrast the majority opinion with the dissent in Marbury Management, Inc. v. Kohn, 629 F.2d 705, 718 (2d Cir.1980), cert. denied, 449 U.S. 1011, *197 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). As the majority stated, 629 F.2d at 710, fn. 3:
[d]ifferentiating transaction causation from loss causation can be a helpful analytic procedure only so long as it does not become a new rule effectively limiting recovery for fraudulently induced securities transactions to instances of fraudulent representations about the value characteristics of the securities dealt in. So concise a theory would be too accommodative of many common types of fraud, such as the misrepresentation of a collateral fact that induces a transaction.
If the concept of loss causation were a necessary ingredient in a conflict of interest case, this requirement would almost never be met. It is hard to imagine a case in which the failure to inform the client is the actual cause of the failure of the investment. There is no question of "investment" or "transaction" causation because the Trust said that they would not have made the investment had the conflict and its consequences been disclosed. If we allow a less stringent accommodation of the concept of "loss" causation, there is no issue as the PPM discloses all the foreseeable losses, including the loss that occurred here, the loss of the Trust's entire investment. This is not a case of "bad investment advice" in which the reason for the investment sprung out of false representations as to its quality.
Another possible analogy is deceit and misrepresentation. In this respect, the old case of Crater v. Binninger, supra, is instructive. There the defendant purchased land and then solicited the plaintiff to invest in an oil company that would explore for oil on the land. The plaintiff represented that the original cost of the land was $28,000.00, that $4,000.00 in working capital would be required, and that the plaintiff's one-eighth share of that $32,000.00 total would be $4,000.00. The speculative investment, plus an additional $500.00, was totally lost.
It turned out that rather than $28,000.00 as claimed, the defendant had paid only $18,000.00 for the land, thus his representation was false. The trial court awarded the plaintiff damages for the difference between the $28,000.00 that was falsely represented as the purchase price and the $18,000.00 that was the actual purchase *198 price, adjusted for plaintiff's one-eighth share. Chief Justice Beasley reversed and held:
There appears no reason for circumscribing the damages of a vendee of property to the difference between the actual and represented cost price of the property. It is obvious, that often his loss will exceed such bound. If the fraudulent representation has been the sufficient cause of the purchase, the actual loss would seem to be the proper and usual measure of redress. But if, on the other hand, the effect of the fraud has been merely to induce the payment of a larger price than would otherwise have been paid, then there would seem to be some substantial ground for the theory that the sum recovered should be the sum comprised in the overestimate of the cost of the property. In this latter case, upon the assumption that the sale would have taken place if the truth had been known, all that the fraud produced is the payment by the vendee of an excessive price; the reduction, therefore, of such excess would afford a fair reparation. But where the sale itself is the product of fraud, the vendee may either repudiate the contract, or claim, by way of damage, the difference between the price paid by him and the real value of the property which he has acquired. This I regard as the general and well established rule. 33 N.J.L. at 515-16.
Applying this holding here, because the real value of the investment at the time of the lawsuit was zero, the damages were the entire investment, as the jury found.
Another analogy is the failure to provide informed consent in a medical malpractice action. For example, imagine the case where a patient reasonably would have avoided surgery if the risk of death, analogous to the loss of the investment here, had been properly disclosed, but has the surgery because of the failure of informed consent and then dies while in the surgeon's hands. Who would question proximate causation?
If a surgeon fails to inform a patient of a material risk, and a reasonable patient, if informed, might have decided not to have the operation, then the causal connection is established between the failure to inform and the unfavorable result. If full disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk resulting in harm, causation is shown. 2 Dooley, Mod Tort Law § 34.55 (1983 Ed.) at p. 505. It is not necessary for the patient to prove that the surgeon's hand slipped, or for that matter, whose action caused the injury. It is sufficient that the injury was foreseeable.

*199 If, then the patient suffers a bad result from treatment, he may have an action on this account if the doctor should have told him of the risk of this result and failed to do so (if the patient would have foregone the treatment had he known the risk) even though the patient cannot show the doctor's negligence in causing the result. This basis of liability makes it unnecessary, therefore, for the patient to adduce expert evidence of the doctor's negligence in treatment. Harper, James and Gray, The Law of Torts, § 17.1 (2d. Ed. 1986) at p. 559.
Accord 70 C.J.S. Physicians and Surgeons § 96(b):
In general, proximate cause, under the doctrine of informed consent, is based on the "but for" notion of causation; that is, defendant's conduct is not a cause of the event if the event would have occurred without it, and the patient, therefore, must show that had he known of the risk, he would not have consented to the medical treatment or procedure.
Here, the failure to inform directly "caused" the investment. The failure of the investment was foreseeable. I therefore find that the jury's decision was easily supportable by the evidence presented. I find that a reasonable jury could have found, as the jury here did, that Lampf-Lipkind's failure to disclose and to warn was the legal and proximate cause of the Trust's injury, and that a compensable injury could have and in fact resulted therefrom. Lampf-Lipkind's motion for a new trial on this basis is denied.

Was the verdict against the weight of the evidence?
Lampf-Lipkind claims that the verdict was against the weight of the evidence in several other respects. It also points to instances in which it claims, Mr. Bergenfield acting improperly, particularly in summation, thus requiring a new trial.
First, there is no doubt that there was more than sufficient evidence to support the jury finding of malpractice. Wasserman outlined Lampf-Lipkind's blatant violation of R.P.C. 1.8:
While violations of ethical standards do not per se give rise to tortious claims, the standards set the minimum level of competency which must be displayed by all attorneys. [citations omitted]. Where an attorney fails to meet the minimum standard of competence governing the profession, such failure can be considered evidence of malpractice. Albright v. Burns, 206 N.J. Super. 625, 634, 503 A.2d 386 (App.Div. 1986).
*200 As to Bergenfield's summation, a summation is intended to be argumentative and sometimes colorful. It is not intended to be a neutral statement of facts as if it were a brief to the Appellate Division on appeal. I instructed the jury to disregard those portions of the summations and other comments of counsel which did not square with their memory of the facts or their interpretation of the evidence.
As to the other issues raised by Lampf-Lipkind, I offered the jury the opportunity to find facts as Lampf-Lipkind would have wished. The jury did not do so. This was a case with sharp factual disputes and while I might have found differently on many issues if I were a juror, I cannot say that:
having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law. [R. 4:49-1]
The jury found that it was not negligence for the trustees to have failed to read the PPM when they relied upon their attorney to read and explain its pertinent parts to them. That was an understandable jury decision. The jury believed expert Wasserman and not expert Wacks. That was an understandable jury decision. The jury believed the Trust's witnesses that they would not have made the investment at all if they had known that the source was tainted with a conflict of interest. That was an understandable jury decision. The other issues raised by Lampf-Lipkind as to the charge to the jury and other items are without merit. The charge was abundantly fair. Lampf-Lipkind's motion for a new trial is denied.

Stay pending appeal
Lampf-Lipkind has argued that I should stay the effect and enforcement of the judgment pending appeal. It argues that its grounds for appeal have merit and if the judgment is not stayed, the law firm will go out of business. R. 2:9-5(a) provides as follows:

*201 2:9-5. Stay of Judgment in Civil Actions and in Contempts
(a) Stay on Order; Bond or Cash Deposit. Neither an appeal, nor motion for leave to appeal, nor a proceeding for certification, nor any other proceeding in the matter shall stay proceedings in any court in a civil action.... A judgment or order in a civil action adjudicating liability for a sum of money or the rights or liabilities of parties in respect of property which is the subject of an appeal or certification proceedings shall be stayed only upon the posting of a bond pursuant to R. 2:9-6 or a cash deposit pursuant to R. 1:13-3(c) unless the court otherwise orders on good cause shown. [emphasis added]
The purpose of R. 2:9-5 is to permit a party to continue execution on a judgment pending appeal unless a bond is posted. Collection of money judgments is often difficult. That a corporate defendant may be on the edge of insolvency is actually more of a reason to require a bond or other security than it is to stay that requirement.
Prior to trial a motion was made before a different judge to amend the complaint to add the lawyers, individually, to the complaint. That motion was denied. Because this case began as a claim for fees in Special Civil Part and a counterclaim for malpractice, that the individual lawyers were not parties apparently went unnoticed by the Trust until just before this case was set for trial. Thus the Trust's judgment is solely against the professional corporation, Lampf-Lipkind.
It would be unfair to allow a defendant to continue its business, perhaps until its assets were completely dissipated, while the appeal process went on with no protection at all for the holder of the judgment.
I have no doubt that given the high reputation for competency of the lawyers and their staffs in tax and pension work, even if Lampf-Lipkind were to disappear as an entity, the lawyers and staff probably could find new employment rapidly. Execution on this judgment would not put 45 people on the street. I am sure that the new law firms to which the Lampf-Lipkind lawyers would migrate would be happy to service the former clients of Lampf-Lipkind. Lampf-Lipkind's former clients would not suffer any hardship. The motion for a stay other than in accordance with the bond or cash deposit provisions of R. 2:9-5(a) is denied.
NOTES
[1] This fact, as well as others, are contested; however, for the purpose of the pending motions, I am setting forth the facts based upon the R. 4:49-1 standard, namely that which a reasonable jury might have found.
[2] R.P.C. 1.8 CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms that should have reasonably been understood by the client, (2) the client is advised of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto.
[3] R.P.C. 1.8(b) provides: "A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation."
[4] Even though I must assume that the jury disregarded his view (R. 4:40-2(b) and R. 4:49-1), I set forth Lampf-Lipkind's expert's position to demonstrate the narrow issues on liability.
[5] This standard looks to whether or not the factual findings are "supported by substantial credible evidence in the record as a whole." Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).
[6] What follows are based on my notes on my charge to the jury. It is not based upon a verbatim transcript and there may be some deviation.